DANIEL NEFF, Respondent, v. MARY NEFF, Appellant.

Kansas City City Court of Appeals, January 4, 1886.

1. PRACTICE—WHEN OFFER OF PROOF REJECTED BECAUSE NO DE-
DENCE—EFFECT OF.—Where defendant offered to make proof of the
averments of her answer, and the court rejected it on the ground
that, if true, the answer constituted no defence, the facts alleged,
for the purposes of this appeal, will be considered as admitted by
the plaintiff.

2. MARRIAGE—GROUNDS FOR ANNULLING—JUSTIFICATION FOR ABAN-
DONMENT.—Although it will not be ground for a court of equity to
nullify the marriage contract that it was brought about by con-
cealment and falsehood, notwithstanding marriage is designated as
a civil contract, yet, that fact is a most potent element in determin-
ing the issue, whether such misconduct, both in bringing on the
union and after it was consummated, did not aid and precipitate the
desertion complained of by the party guilty of such misconduct.

3. DIVORCE—DESERTION WITHOUT REASONABLE CAUSE.—Although the
wife may have acted improperly in leaving home, yet, that will not
justify the husband in putting himself in a situation which pre-
vents her return. For specific causes the married state may be de-
stroyed, but he or she who is instrumental in producing the cause for
a divorce can never avail himself or herself of it. The conduct of
a husband toward his wife may be such as would warrant her in
*leaving* him, *although it would not entitle her to a divorce.* Unless
he is an innocent and injured party, he is not entitled to divorce.

4. ———— WHAT PROCEDURE GOVERNS IN SUCH CASES.—In applications
for divorce, the recognized principles of equity procedure should so
far adhere to this proceeding, as to require of the party seeking to
nullify so solemn a compact as that of marraige, which constitutes
the cement of society and the amulet of its protection, that he
should come with clean hands, and should not have equity
where he has not done equity. And *his* misconduct will be consid-
ered as qualifying *her* offence and his right to rely upon it as a
cause for dissolving the marriage relation, in whole or in part.
*Lyster v. Lyster*, 111 Mass. 327 ; *Yeatman v. Yeatman*, Law Rep., 1
P. & M. 491.

APPEAL from Caldwell Circuit Court, HON. JAMES
M. DAVIS, Judge.

*Reversed and remanded.*

Statement of case by the court.

This is an action for divorce. The material allegations of the petition are, that plaintiff and defendant were married in October, 1878, and continued to live together as husband and wife until the year 1880 ; that plaintiff faithfully discharged all his duties as such husband, and treated defendant with kindness and affection ; but the defendant had absented herself from plaintiff since December, 1880, without reasonable cause, and has continued to so live apart from him until the institution of this action, February 9, 1883.

The answer admitted the marriage and that she was living apart from plaintiff, and denied all other allegations. It also avered "that previous to said marriage, plaintiff was affected with a disease known as fits, which for the time being produced convulsions and rendered him unconscious of what he was doing ; that while undergoing an attack from said disease his condition was such as to inspire fear and terror in any but the bravest and most courageous ; that her organization and temperament is such that she is easily agitated and frightened ; that previous to their marriage, she heard rumors that he was afflicted with said disease, and asked him if it was true and informed him she would not marry him if he was afflicted with said disease, for she was sure that the affliction would render her condition as his wife intolerable and unendurable ; that he then represented that at one period in his life he had been troubled with attacks of that character, but that it had been a number of years previous thereto ; that he had been entirely cured of said disease ; that he had not had an attack for several years, and that everything indicated that there would be no recurrence. Defendant says that at said time she had the most implicit confidence in the honor and truthfulness of plaintiff, and fully believed his statements to her to be true, and continued to believe said statememts to be true, until after their marriage. But she says said statements were false ; that plaintiff had

not been cured ; that he had numerous attacks of said disease, and that some of said attacks were but a few days prior to his said statements ; that he well knew at the time he made the aforesaid representations as to his condition that they were false and fraudulent, and were made on purpose to deceive her as to his true condition in that respect ; that just previous. to their marriage he had numerous attacks at divers places, and cautioned those aware of it not to say anything about it lest defendant might learn of it ; and he assured her at different times that he was cured of it ; that very soon after their marriage he had a severe attack at their residence ; that she was very much frightened and agitated in consequence ; that there were no other persons in the building at the time ; that she begged him for company, for some one to be with and assist her in waiting on him while he was suffering from said attacks, but he neglected to procure such assistance and company, and as a consequence a constant dread preyed upon her mind, her nerves became disordered and her health failed ; that previous to their first separation he had numerous attacks and her health became so impaired as to make life a burden ; so that separation, with a change of scene and associations, became a necessity. She says that after leaving him the first time, and after her health had somewhat improved, he desired her to return and she promised to do so, provided he would agree to get one of his sisters or some one else to stay with them and to aid in taking care of him during his sickness, and to be company for her, as it would ruin her health to stay without such company. This plaintiff agreed to do, and influenced by his promises, she returned to him ; but he failed to observe his promises, and when she had procured another woman to stay with her, without cost or expense to him, he became cross, scolded her and so conducted himself as to render her condition unendurable, so that she was compelled to choose between separation and an early grave. She says that she has in all things and at all times conducted herself as a good and dutiful wife, and that it is no fault

of hers that she is not living with him, but a necessity forced on her by the false representations and broken promises of plaintiff. She says she is without means of support, except daily labor, and that plaintiff is a physician and surgeon, and owns property of the value of $3,000 or $4,000. Wherefore, she prays the court to allow her reasonable alimony for her support and maintenance," etc.

Defendant's answer, also, contained a cross-bill setting up all the matters stated in the answer; and further, "that soon after their marriage, plaintiff again had fits and she was thereby very much disturbed and frightened, and while giving plaintiff care in his unconscious and helpless condition, was very much wearied and overworked in consequence of which her health became impaired," etc. "That finally, in consequence of his misconduct, her fright, overwork, and anxiety, her health became so broken and her condition so wretched and intolerable as to necessitate a separation from plaintiff." This cross-bill was verified and prayed for a divorce.

The reply was a general denial of the new matter.

At the trial, after plaintiff had offered evidence tending to support the allegations of the petition, the defendant offered to make proof of the affirmative facts set up in her answer. On objection of plaintiff, the court refused to hear the proof, on the grounds that the matters so pleaded constituted no defence to the action. The court thereup rendered judgment, decreeing a divorce to plaintiff. Defendant has brought the case here by appeal.

CROSBY JOHNSON, for the appellant.

I. The matter alleged in the answer and cross-bill justified defendant in living apart from her husband. *Gillinwaters v. Gillinwaters*, 28 Mo. 60; *Hooper v. Hooper*, 19 Mo. 356; 15 Am. Dec., 210, and note; *Powell v. Powell*, 29 Vt. 148; *Molony v. Molony*, 2 Add. 249; 2 Eng. Ec., 291; 1 Bishop on Mar. & Div., sect. 764.

II. The court erred in excluding evidence offered by defendant. 1 Bishop on Marriage and Divorce, sects. 728, 732.

J. E. WAIT, JESSE ROSS, and W. A. WOOD, for the respondent.

I.   A suit for restoration of conjugal rights can be maintained, and nothing but such facts as would entitle defendant to a divorce would be any bar thereto.  *Oliver v. Oliver*, 1 Haggard Con. R. 361; *Dysart v. Dysart*, 1 Robertson Ec. 106; *Butler v. Butler*, 1 Pars. Sel. Cas. 329; *Moore v. Moore*, 10 N. J. Eq. (1 C. E. Gs.) 275; 15 Am. Dec. 212.

II.   The conjugal relations ought to be rigidly adhered to, and a marriage procured by fraud furnishes no ground for divorce.  *Varney v. Varney* (38 Am. Rep. 726) 52 Wis. 120; *Long v. Long*, 24 Am. Rep. 440.   The *Messenger case* seems to furnish the nearest analogy to the case at bar, of any to be found in this state.  *Messenger v. Messenger*, 56 Mo. 329.

PHILIPS, P. J.—I.   By the offer of defendant to make proof of the averments of her answer, and its rejection by the court, the facts alleged for the purpose of this appeal stand admitted by the plaintiff.   The question, therefore, to be decided is, do the facts pleaded show that defendant's desertion was "without reasonable cause?"

The facts disclosed by this answer are strikingly peculiar; and they certainly present a situation of distressing wretchedness into which the marriage relation has brought the defendant, without any seeming fault on her part.

This plaintiff appeals to the law to free him from the bonds of matrimony contracted with defendant, and thereby to have him and his property discharged from the obligation and burden of her protection and support.   The burden of proof rests upon him, not only to show the abandonment, but that the desertion was "without reasonable cause."   As this case stands in court, the plaintiff admits that before, and up to the time of, his marriage with defendant he was subject to fits, which, from their

characterization in the answer, we infer were epileptic in form. This fact he not only concealed from the defendant, but positively assured her did not exist, and thereby induced her into an alliance, which ordinarily a woman of intelligence would shrink from.

This disease is one of a peculiarly repulsive character, and dreadful to behold. It is accompanied by unconsciousness, convulsions of body and face, and foaming at the mouth. It is so horrible that in the rude ages the Romans and Egyptians regarded epileptics as having excited the anger of the gods, and were worshiped as possessing supernatural power. "This was due to the violence and extraordinary force developed by the muscles in epileptic convulsions; the screaming, the changes in color, the contortions of the face, and the biting of the tongue, followed by a comatose state, and afterwards by a degree of mental alienation." Am. Cyclopædia, vol. 6.

In the new version of the New Testament, Saint Matthew designates as epilepsy the disease of the boy brought by his father to Jesus to be healed, after the scene of transfiguration in the mountain; and which is so graphically described by Saint Mark (ch. 9) as a dumb beast and spirit, tearing the boy as he foamed and "gnasheth with his teeth and pineth away."

It is, moreover, regarded by scientists as congenital; and is, therefore, far-reaching in its hurtful effects.

That its manifestations in defendant's husband should have produced in her mind the terror and dread she depicts in her answer, is neither extraordinary nor improbable. That a woman of delicate constitution, and highly developed nervous organism should constantly look forward to the recurrence of these frightful exhibitions in her home with horror was but human. That such a life, with its strain upon the mind and nerves, should "work like madness in the brain," and gradually undermine her health, is equally probable and natural.

This woman, perhaps, could no more help her nervous infirmity than could the plaintiff escape from his malady. Neither should she be censured for the results of

that which is more a misfortune than a moral vice. Had this disease come upon plaintiff after the defendant had taken him "for better and for worse," she could be held with more reason to bear her misfortune with patience and fortitude, than under the circumstances disclosed by her answer. But she accepted his hand on his assurance that whatever else might be his bad qualities and defects, this epilepsy was not of them. And when she discovered that she had been deceived into "bonds of wretchedness and oppression," instead of justly anticipated happiness, it certainly should not only break the force of any adverse criticism on her imputed lack of wifely devotion and sacrifice, but it should have stimulated the plaintiff to every reasonable and manly effort to do all in his power to mitigate her misery, and repair the wrong.

So great is the regard of the law for the sanctity and stability of the marriage relation that, although marriage is designated as a civil contract, it will not be ground for a court of equity to nullify the contract brought about as this was by plaintiff's concealment and falsehood. *Reynolds v. Reynolds*, 3 Allen 605 ; *Varney v. Varney*, 52 Wis. 120. But I maintain that in this controversy it is a most potent element in determining the issue, whether plaintiff's misconduct, both in bringing on the union and after it was consummated, did not aid and precipitate the desertion of which he complains. Certainly after the defendant was fraudulently brought into the toils, she exhibited a commendable spirit in clinging to him as she did ; and the request she made of him for the company of some one, even of his own kinswomen, to aid her in succoring him in his spasms, and to share with her, or relieve her in part, from the frightful scenes, was both reasonable and moderate.

Having in his power to alleviate to this extent, at least, the situation of his wife, he had no right to immolate her upon the altar of his selfishness and supposed dominant rights as husband and master of his household. To do so, was as unnecessary as it was cruel and unmanly. And after his malady, which he deceived de-

fendant about, coupled with his refusal to try to relieve her in the small degree requested, had driven her to the dire necessity of choosing between the alternative of adhering to his bed and board, with the grim spectre of his epileptic contortions now and then appearing at the hearth-stone, with no companion to relieve her misery, and no succor to rescue her from despair and loss of health, or seek relief, rest, and health in desertion, the law that would give him a divorce on the ground that she had deserted him, without cause, would be a travesty on justice and repugnant to the common sense of right.

It is true, the law is not founded on sentiment. But it does profess to respect natural justice, and to provide rational rules for the conduct of the practical affairs of social life. As is said by Marshall, C. J., in *Mayhugh v. Mayhugh* (7 B. Mon. 424, 428): "The criterion by which, in human tribunals, the conduct of human beings is to be estimated, should be formed, not according to the rules of either ideal perfection or of occasional excellence, but according to that standard which, being attainable by the various classes to which it is to be applied, is sufficiently high to ensure the preservation and promotion of the morals and good order of society."

Mr. Bishop, in his treatise on Marriage and Divorce, contends with force and reason for the rule that the cause which will justify the desertion by either party, ought to be such only as will, under the statute, entitle the deserter to maintain an action for divorce.

As the respondent, at the bar here, does not insist on her cross-bill, we need not determine whether the facts alleged therein would entitle the defendant to affimative relief.

While the position of that eminent text writer is supported by most respectable authority and plausible logic, there are authorities of equal dignity maintaining that relief maybe denied to the petitioner, although the party deserting may not be entitled to a divorce. They are collected in *Lyster v. Lyster* (111 Mass. 327); and others might now be added. But, whatever other

courts may have held, I cannot understand language if
our supreme court, in *Gillinwaters v. Gillinwaters* (28
Mo. 60), does not hold contrary to Mr. Bishop. The
husband sued for divorce on account of the desertion of
the wife. Judge Scott, who delivered the opinion, *inter
alia*, said : "Although the wife may have acted improp-
erly in leaving home when she did, yet, that did not
justify the husband in putting himself in a situation which
prevented her return. * * * For specific causes the
married state may be destroyed, but she or he who is in-
strumental in producing the cause for a divorce can never
avail himself or herself of it. * * * The conduct of the
husband toward his wife may be such as would warrant
her in leaving him, *although it would not entitle her to
a divorce*. The record does not show that he is an inno-
cent and injured party, and, therefore, he cannot re-
cover."

It would be difficult to find language on any proposi-
tion of law more specific. And in the case of *Harper v.
Harper* (29 Mo. 303), this same learned judge said : "A
married couple should yield a little to each other's incli-
nations, although they may appear somewhat unrea-
sonable ; and though there may be no criminality in
refusing to do this, yet, when by obstinacy and non-
compliance, an alienated state of mind is produced
between them, they cannot expect the courts will lend
too indulgent ear to their application for divorce. Courts
will not grant divorces to those who, by a long course of
ill-advised conduct, have produced a state of things
which would seemingly warrant such a measure."

The *Gillinwaters case* has not been overturned, and
the language quoted therefrom has never been criticised
by the supreme court. It has ever been the recognized
rule on the circuits, and it ought not, in my humble
opinion, to be disturbed.

Some significance, whatever refinement Mr. Bishop
may attach to it, ought to be given, in my judgment, to the
language of our statute : "without reasonable cause."
It is not a statutory cause for divorce. But it is a *rea-*

*sonable* cause; such as tested by the rules of common sense and a wise experience, and not hurtful to society, may be said to be reasonable.

Just as the courts, in defining negligence and care, say it is to be tested by the degree of caution and care which reasonable persons, under like circumstances and conditions, are expected to exercise.

Again, the proceedings for divorce belong, ordinarily, to the courts of equity jurisdiction. And while this is regulated in this state by statute, yet it so far preserves its chancery qualities that the trial is had before the court, without the right, as in actions at law, to demand a jury. And the court is invested with large discretionary powers in awarding alimony, *pendente lite*, as also the custody of the children, and changing orders from time to time as to the court may seem just, etc. · The recognized principles of equitable procedure should, therefore, so far adhere to this proceeding as to require of the parties seeking to nullify so solemn a compact as that of a marriage, which constitutes the cement of society and the amulet of its protection, that he should come with clean hands, and should not have equity where he has not done equity.

There is, therefore, sound reason and equity in the enunciation of Gray, judge, in *Lyster v. Lyster, supra,* that: "A just application of this principle requires that misconduct of the husband, not amounting to a cause of divorce, and which affords no reason why, upon his undertaking to conduct himself properly for the future, the marital relation should not be fully re-established by judicial decree, may yet, when he makes no offer to amend his course, but seeks for a judicial separation for his wife's breach of duty, will be considered as qualifying her offence and his right to rely upon it as a cause for dissolving the marriage relation, in whole or in part."

The divorce court of England, under a statute of "desertion without cause," hold to this view, that the desertion is "justified by conduct that would not

authorize a decree." *Yeatman v. Yeatman*, Law Rep. 1. P. & M. 491.

In the case at bar, the plaintiff's malady, coupled with his refusal to permit her any relief, brought his wife into a terrible strait. It destroyed her peace by day and night; and imperiled her health and life. It was in his power, by a most reasonable concession, to mitigate that condition. It required no sacrifice, no humiliation. It was but what should have been the voluntary offering of a generous heart and a loyal husband. Shall the court free him, as the innocent and injured party, while the wife, whom his want of charity and humanity has driven from his home, is pronounced by the judgment of the law as the party in fault, to be stripped of all that her relation as wife secured her?

I think if a man is to be accorded a divorce under such circumstances that society must be the sufferer, as well as she who is the victim of his deceit and neglect. A man by a course bordering on cruelty, yet keeping barely inside of the dividing line of the statutory cause of divorce, may impel his wife to seek peace and health by fleeing from his home, and then get rid of her entirely by alleging her desertion.

I am of opinion that, before he can put this woman in legal fault, he should show more charity, compromise, and consideration for her, whom he has pledged to cherish and protect. *Cornish v. Cornish*, 23 N. J. Eq. 208.

Let the judgment of the circuit court be reversed, and the cause remanded for further proceeding in conformity herewith. All concur.