AUSTIN DAVIS, Respondent, v. HATTIE F. DAVIS, Appellant.

Kansas City Court of Appeals, January 28, 1895.

1. **Divorce**: ELEMENTS OF ABANDONMENT: LONG ABSENCE. To establish desertion, three things must concur: Cessation from cohabitation continuing one year; intention in the mind of the deserter not to resume cohabitation; the absence of the other party's consent to the separation. Long absence with consent affords no ground for divorce.

2. ———: ABANDONMENT: JUSTIFICATION. If the refusal to live with the spouse is the natural and probable result of the spouse's conduct, the offensive character of the abandonment is reduced below the degree which the law requires to justify the dissolution of the marriage bond; and, while the relation may be dissolved for specific causes, the one instrumental in producing such cause can never avail thereof.

3. ———: EVIDENCE: APPELLATE PRACTICE. On a review of the evidence in this cause, it is *held*, not sufficient to sustain a decree of divorce for the plaintiff; and the appellate court, following the rule that it is not bound in equity and divorce proceedings by the findings of the lower court, though it should defer to such findings, reverses the judgment.

*Appeal from the Jackson Circuit Court.*—HON. S. W. MOORE, Special Judge.

REVERSED.

*Robert Adams* with *Barry & Blanchard* for appellant.

(1) Upon the evidence in this cause the court erred in granting to the respondent a divorce. In this

state to entitle a party to a dissolution of the marriage tie on the ground of desertion the other must have absented himself or herself without reasonable cause for the space of one year. *Bailey v. Bailey*, 21 Gratt. 43–47; *Cox v. Cox*, 35 Mich. 461, 463; *Crow v. Crow*, 23 Ala. 523. (2) The absence of appellant, of which respondent complains, was voluntarily produced and continued by him, and to which he consented, and in legal sense he is not injured. *Dwyer v. Dwyer*, 16 Mo. App. 422–427; *Simpson v. Simpson*, 31 Mo. 24; *Gillenwater v. Gillenwater*, 28 Mo. 60; *Scott v. Scott*, 44 Mo. App. 600; *Gilmer v. Gilmer*, 37 Mo. App. 671; *Droege v. Droege*, 55 Mo. App. 481; *Gray v. Gray*, 15 Ala. 779–784; *Cornesh v. Cornesh*, 35 N. J. Eq. 208, 209; *McDonald v. McDonald*, 4 Swart & T. 242; *Teatman v. Teatman*, S. R. & P. & D. 489, 490. The conduct of respondent was such as to warrant her refusal to live with him. He is not an innocent and injured party and entitled to a divorce. *Neff v. Neff*, 20 Mo. App. 182; *Gillenwater v. Gillenwater, supra.* (3) If it be true that the appellant refused to live in Kansas City, with her husband, the refusal was the natural and probable result of his own conduct and extenuates her acts and is not desertion within the meaning of the statutes. *Owen v. Owen*, 48 Mo. App. 208, 211; *Hoffman v. Hoffman*, 43 Mo. 547, 551; *Doyle v. Doyle*, 26 Mo. 545; *Gillenwater v. Gillenwater, supra; Harper v. Harper*, 29 Mo. 301. (4) The recriminatory allegations of adultery of the respondent are fully sustained by his own testimony. *Lovidon v. Lovidon*, 2 Hagg. Cons. 1; 4 Eng. Ecc. 461; *Burgess v. Burgess*, 2 Hagg. Cons. 223, 226; 4 Eng. Ecc. 527, 529; *Chambers v. Chambers*, 1 Hagg. Cons. 439–445; *Evans v. Evans*, 41 Cal. 103, 107; *Mosser v. Mosser*, 29 Ala. 313–317; *Inskeep v. Inskeep*, 5 Iowa, 204–208; *Allen v. Allen*, 101 N. Y. 658; *Moller v. Moller*, 115 N. Y. 466; *Thayer v.*

Davis v. Davis.

*Thayer*, 101 Mass. 111–113; *Whitmack v. Whitmack*, 36 N. J. Eq. 474; *Smith v. Smith*, 5 Ore. 186, 187.

*W. A. Harnsberger, Karnes, Holmes & Krauthoff* for respondent.

(1) The law makes it the duty of the wife to follow the fortunes of her husband. Her voice should be like that of Ruth to Naomi: "Whithersoever thou goest, I will go; where thou lodgest, I will lodge; thy people shall be my people, and thy God shall be my God." *Messenger v. Messenger*, 56 Mo. 329, 337; *State v. Greenup*, 30 Mo. 299; *Spengler v. Spengler*, 38 Mo. App. 270; *Kaster v. Kaster*, 43 Mo. App. 115; *Droege v. Droege*, 52 Mo. App. 84. (2) The evidence in this case is very conflicting. The witnesses were before the court. The defendant came out from Boston with her able counsel to represent her. She told her story, and it was not believed by the trial judge. *Droege v. Droege, supra; Clark v. Clark*, 48 Mo. App. 157; *Griesedieck v. Griesedieck*, 56 Mo. App. 94; *Stevenson v. Stevenson*, 29 Mo. 95; *Gillespie v. Gillespie*, 28 Mo. 598; *Nichols v. Nichols*, 39 Mo. App. 291.

SMITH, P. J.—This is an action of divorce, the ground thereof being that of desertion. The answer was a general denial, coupled with the charge of adultery. There was a trial in the court below, resulting in a decree for plaintiff, from which defendant has appealed.

The first question which is presented for our decision by the defendant's appeal is whether the charge made in the petition, that the defendant has absented herself without a reasonable cause for the space of one year, is sustained by the evidence contained in the

record before us. The determination of this question has imposed upon us the duty of examining nearly four hundred pages of printed evidence, which, in many particulars, is quite contradictory. It appears that from 1870, the time when plaintiff and defendant were married, until the fall of 1887 there is little or nothing in the history of their marital relations which, in any way, tends to support the charge contained in the plaintiff's petition. It appears that plaintiff was a butcher and has been engaged, since the date of his marriage, in slaughtering and supplying some of the eastern markets with dressed meats. This business he has carried on, with occasional intervals, with varying success, at Kansas City, Boston, Chicago and other places. In the summer of 1887 the plaintiff was engaged in business in New York City, while defendant lived in a boarding house in Boston, where resided the relatives and friends of both parties. During plaintiff's stay in New York he was in the habit of visiting defendant fortnightly. Finally, about the ninth of September, of the year just mentioned, the plaintiff visited defendant and, without her knowledge, sold and disposed of his horse, buggy, sleigh and harness, after which he left, presumably for New York, from where, on the nineteenth of September, he wrote her a letter telling her that he supposed she would be surprised to learn he was going west. When he went away he was indebted to his landlady for his wife's board. Defendant was thus left helpless and penniless. She was compelled to dispose of certain articles of personal adornment to pay her board. The shock occasioned by this behavior of plaintiff rendered her sick in mind and body, utterly prostrating her. Vain were endeavors to find out what had become of her fugitive husband, until a sympathizing mother-in-law, by an anonymous letter, indicated his whereabouts. After the lapse of several

days defendant, by telegraph, finally reached plaintiff at Omaha, in the state of Nebraska. In his letter, without date, responding to defendant's telegram, plaintiff tells her that he had no idea of leaving her unless she gave him reason for doing so, and that he hoped she would forgive him this time for what he had done, and that he would never do so again as long as he lived. Defendant testified that, in reply to this letter, she wrote to the plaintiff, that a Mr. and Mrs. Hollis had informed her that he had told them that he was going to leave her because she was extravagant, and also that she had every reason to believe that he had gone west with a woman. Defendant, testifying in the same connection, produced another letter from plaintiff, in which he informed her that he was in Kansas City in business; that "I never will treat you like I have. All I want you to do is to excuse me for what I have done. * * * All I want of you is to say you forgive me, just this time, and I will always make you happy." It is clear from a letter of plaintiff to defendant, dated New York, February 15, 1888, written while he was in business in that city, in answer to one previously received by him from her, that the latter must have then had some intimation of the plaintiff's improper relations with another woman; for plaintiff, in his letter, says: "There is one thing that I will do, and I suppose will please you, and that is before I come home, will sell everything out and find a room up town for my things and get my meals at stock yards, and *live in my room all alone and bring no one else with me. The party you speak about is gone to work in a store at once and going to board with friends of hers and take care of herself.*" This is a confession that the plaintiff had been living in a room with a woman in New York City. This letter, however, gave defendant the assurance that

the plaintiff would lead a better life, and that when he returned to Boston, he would bring satisfactory evidence of it along with him. The plaintiff himself, in his testimony, admitted that he engaged Rose Goodwin to go from Boston to New York to keep house for him, but stated that she returned to Boston without doing so. There is other evidence showing that she occupied, not only the same room, but the same bed with the plaintiff during part of the time the latter resided in New York City. The plaintiff further admitted in his testimony that when he left New York, at the time heretofore stated, Miss Goodwin accompanied him. The defendant, without previous warning to plaintiff, came out to Kansas City, and after consultation with the chief of police on the twenty-sixth of December, 1887, in company with two detectives, took a carriage and drove over to Armourdale, in the state of Kansas, to a house where the plaintiff was reported to be then residing, arriving there about half past 10 o'clock that night. The defendant, after one of the detectives had pointed out the plaintiff's house, approached the door and knocked for admittance. The response was, "Who is it?" The defendant answered, "A telegram." After this, plaintiff raised the curtain over the half-glass door and repeated the inquiry, "Who is it?" The defendant replied, "I should think you would know who it is." The plaintiff then ejaculated, "My God! it is Hattie." The defendant testified that just after this she saw someone jump out of the plaintiff's bed and run past the door in a night dress with some clothes in her hand. The plaintiff opened the door and admitted the defendant. The defendant demanded to know of plaintiff who was in the room with him when she came, and he protested that there was no one. The defendant then looked about the room and found a set of artificial teeth and a woman's switch of hair on the

bureau, and in the bureau were various articles of female apparel. After quite an extended colloquy between the plaintiff and defendant, the latter was admitted into a room, usually occupied by one Charley Barry and his paramour, Miss Briggs. Finding no one there, defendant proceeded to the kitchen, where she found Miss Briggs and Miss Goodwin. It is unnecessary to repeat the unpleasant remarks exchanged by these parties on that occasion. The plaintiff and Miss Goodwin, each in their testimony, deny that the latter was occupying the same bed with the former; while Miss Briggs, in her testimony, corroborates defendant's statement that such was the fact. The plaintiff in his testimony stated, that it was true that Miss Goodwin occupied the same room as he did, but that their beds were not the same, and that there was a hanging curtain which separated the room into two apartments, she occupying one of these and he the other.

The defendant, after remaining in plaintiff's house two or three hours, returned to her hotel in Kansas City the plaintiff not accompanying her. The defendant, the next day, met the plaintiff at her hotel, according to defendant's testimony, and, after several hours conversation, in which plaintiff stated that things had gone so far that he could not leave Rose Goodwin, the defendant thereupon returned to Boston. The defendant testified that, en route to Boston, she wrote plaintiff several letters, reproaching him for his infidelity and bad treatment. In reply to one of these the plaintiff stated: "I have just received your letter and feel bad when I read it. It came around all right what you wanted me to let you know." The defendant testified in explanation of the reference contained in the above quotation, that this was in answer to a request of hers to know whether Miss Goodwin was in the family way or not.

It appears further that, after defendant returned to Boston, the plaintiff wrote to her to the effect that she should share one half of the profits of his business, and later on, when he visited that city, he had a lawyer to draft a contract with the defendant to that effect. The defendant was very unhappy and the plaintiff, while declining to abandon his relations with Miss Goodwin, agreed to contribute $20 per week for the defendant's support.

After this, plaintiff made two visits to Boston, and, during the second, the defendant sent for him and had an interview with him in the presence of Miss Taylor, when defendant asked plaintiff if he was willing for her to go to Europe, and, if so, how much of an allowance would he make her; and that plaintiff replied that defendant had his full consent to go, and that he would allow her $20 per week during her absence there and if, in case of illness, this should be insufficient, he would allow her more; besides this, he would advance her $60 on her weekly allowance, before starting. There is much other evidence showing that the plantiff gave his unqualified consent that defendant should go abroad. About the seventeenth of October, 1888, the defendant sailed for Bremen and on the voyage was so unfortunate as to get a fall, whereby she broke one of her legs. The result was, after her arrival in Germany, she was for many months, confined in a hospital. Defendant remained abroad something over four years. From her letters to her husband and others, it appears that during this period she was in bad health and was a most unhappy and wretched woman. It appears that plaintiff continued to make the promised remittance and, on several occasions, sent defendant additional sums to defray her expenses, which were greatly increased on account of her protracted ill health. In none of the letters of the plaintiff to defendant, while she was

abroad, is there to found a word of protest against her continued absence, or any indication that he desired her to return to him. There is the assurance made in one of them that he would continue to send her the promised stipend as long as she remained abroad.

Finally, in August, 1892, while defendant was still abroad, the plaintiff wrote the defendant's brother, who resided in Boston, stating that he declined to make him any further remittances for defendant, since he had supported her for years, during which time she has persistently remained away and refused to live with him as his wife. This letter was transmitted to defendant, who was then at Dresden, Germany, from which place she wrote the plaintiff bitterly reproaching him for making the false charge contained in his letter to her brother. In this letter, the defendant wrote: "Why you have taken this step toward me, I can not understand. No matter what our troubles have been, and the feelings we have had toward each other, one thing I must say, Austin, I never thought you so cruel hearted to leave me in a strange land penniless, or even without one line. What have I done to you to cause you to treat me like this? You assured me you would support me which is no more than right. *I was not the one who broke the link between you and I.*" * * * "Remember this, as long as you were willing I remain here and sent me my allowance, I have done so; otherwise, I should have returned." The letter makes a touching appeal to plaintiff's honor and manhood for justice. Hearing nothing further from plaintiff, she, being provided with necessary funds by relatives, returned to Boston. Shortly after this, the plaintiff brought this suit.

It appears that Rose Goodwin has resided with plaintiff continuously since their life began together in New York, in 1887. The plaintiff's father, mother, brothers and sisters, all testify that they had visited

him at his house in Kansas City, when Miss Goodwin was acting as his housekeeper, and that they observed nothing improper in his relations with his housekeeper. There is evidence tending to show that at times Miss Goodwin was addressed by her acquaintances and neighbors, in the presence of plaintiff, as "Mrs. Davis" and there was no denial of the "soft impeachment;" while, at other times, when so addressed, there was. One of plaintiff's landlords got the impression, in some way, that Miss Goodwin was the cousin of the plaintiff. It appears from the testimony of the witness, Caroline Williams, that Miss Goodwin "was a very becoming looking woman, who had dark hair and hazel eyes, and was not very fleshy."

There is nothing to be found in the entire record which, in the slightest degree shows that the defendant is not a woman of excellent character in every respect. She seems to be an exceedingly bright, intelligent and proud spirited woman, possessing great courage and individuality, and, besides, a refined and sensitive nature. The plaintiff, to his great credit, has shown himself to be an industrious and money making man, whose commercial standing is excellent.

We must now make answer to the question which was suggested by us at the outset. In order to establish desertion, three things must concur: *First.* Cessation from cohabitation continuing one year; *second*, the intention in the mind of the deserter not to resume cohabitation, and, *third*, the absence of the other party's consent to the separation, or conduct acquiescing in the same. If it be conceded that the evidence conclusively establishes the existence of the two first of these, it must be also conceded that there is a total absence of evidence establishing the third. It may be contended that the defendant's absence was unjustified; yet, the plaintiff, by his subsequent

conduct, acquiesced in the separation, and hence there was no desertion within the meaning of the statute, at the time of the commencment of the suit. The irresistible inferences to be drawn from the facts which the evidence conduces to prove, is that the defendant lived away and apart from plaintiff, with his acquiescence. It appears that he supplied the needed money for her traveling expenses, board, clothing, medical attendance, etc., during the years she lived in the East and he in the West. These and other circumstances show his complete acquiescence in her continued absence. But we do not think the defendant's absence is justified alone by the plaintiff's acquiescence. It has a still stronger justification than this, namely: the plaintiff's express consent. The plaintiff gave his unequivocal consent for the defendant to make the visit she did to the continent of Europe. He supported her while there, and when he withdrew his support and, impliedly, his consent for her longer to remain there, she promptly returned to Boston. In any view of the evidence that may be taken it does not appear to us that the defendant had absented herself from plaintiff for one year next before this suit was brought, without the plaintiff's consent. The absence of the husband or the wife, the one from the other, however long, affords no ground for divorce, if such absence is with the consent of such other. The foregoing statement of the law is established by an unbroken line of appellate court decisions in this state. *Droege v. Droege,* 52 Mo. App. 481; *Gilmer v. Gilmer,* 37 Mo. App. 672; *Dwyer v. Dwyer,* 16 Mo. App. 422; *Scott v. Scott,* 44 Mo. App. 600; *Neff v. Neff,* 20 Mo. App. 182; *Simpson v. Simpson,* 31 Mo. 24; *Gillenwater v. Gillenwater,* 28 Mo. 60; and in the states of Virginia and Alabama, at least, *Bailey v. Bailey,* 21 Gratt. 43; *Crow v. Crow,* 23 Ala. 523.

The above cited cases of *Gillenwater v. Gillenwater*, and *Neff v. Neff*, establish the doctrine that, when the conduct of the husband or wife is such as to warrant the refusal of the one to live with the other, then such other is not an innocent and injured party and is not entitled to a divorce. And so the rule obtains in those cases where one of the parties refuses to live with the other and the refusal is the natural and probable result of the other's conduct and hence extenutates his or her acts and reduces the offensive character below the degree which the law requires to justify a dissolution of the marriage bond. For specific causes the marriage relation may be dissolved, but he or she who is instrumental in producing the cause can never avail himself or herself of it. *Owen v. Owen*, 48 Mo. App. 208, 211; *Hoffman v. Hoffman*, 43 Mo. 547, 551; *Doyle v. Doyle*, 26 Mo. 545; *Gillenwater v. Gillenwater*, 28 Mo. 60; *Harper v. Harper*, 29 Mo. 301.

It is true the evidence discloses the fact that the defendant did not cohabit with the plaintiff after some time in the summer of 1887, and thereafter lived separate from him. Still, according to the authorities just referred to, this does not warrant a dissolution of the marriage relation between the parties, for the reason that, in one of the plaintiff's own letters to defendant, written the day following the last night that plaintiff and defendant occupied the same bed, there is the confession that plaintiff was afflicted with a vile and abominable private disease, coupled with the advice to defendant to subject herself to certain treatment to avoid contracting his infection. Not only this, but the indubitable evidence of defendant's knowledge that the plaintiff, during the last seven or eight years of the time defendant lived apart from him, was living in a state of concubinage with his housekeeper. It is true that the innocence of the plaintiff and his house-

keeper is earnestly protested by them; but in the face of the overwhelming array of facts and circumstances to the contrary, which have been already mentioned, to such protest we can give no heed. Many of the threads of circumstances are, perhaps, weak, but when united they are strong enough to irresistibly lead the mind to but one conviction, and that is that plaintiff's own demeanor has not been as faithful as it ought to have been. So that we feel justified in the conclusion that the plaintiff's conduct was the efficient cause in bringing into existence the very conditions of which he now complains and therefore he is not the injured and innocent party. We regret that we are unable to sustain the decree of the learned special judge who tried this case. The deductions we make from the evidence differ widely from his. It is true, as abundantly shown by the numerous cases cited by council for plaintiff, that the rule of practice in equity and divorce cases, when the evidence is conflicting and the decision depends upon the credibility of the witnesses, is that the appellate courts are not bound by the findings of the lower court, but defference should, nevertheless, be paid to its findings.

If all the contradictory evidence were expunged from the record and excluded from consideration, that remaining would be quite ample to justify the denial of the divorce. We feel constrained by our convictions of duty to reverse the decree, which is accordingly ordered. All concur.