## MASON CREASEY, Appellant, v. CARRIE B. CREASEY, Respondent.

### St. Louis Court of Appeals, November 12, 1912.

1. DIVORCE: Desertion: Efforts at Reconciliation. Where a husband abandons his wife without cause, it is necessary for him to show, in order to entitle him to a divorce on the ground that the wife was guilty of desertion, under Sec. 2370, R. S. 1909, in refusing to return to and live with him, that he offered in good faith to effect a reconciliation and to return to her or take her back, that she refused his offer, and that such refusal continued for the statutory period of one year.

2. ———: ———: ———. Where a husband abandons his wife without cause, he will not be heard to charge her with desertion on the theory she refuses to return to him, unless he seeks a reconciliation and offers to return to her or take her back; and such offer must be made with the bona fide intention of bringing about a reconciliation and not merely as a device to defeat her in divorce or maintenance litigation.

3. ———: ———: Effect of Acquiescence. In order to warrant a divorce on the ground of desertion, under Sec. 2370, R. S. 1909, the defendant must have been absent from the plaintiff without the consent of the latter, for the full period of one year.

Creasey v. Creasey.

4. ———: ———: **Efforts at Reconciliation: Refusal: Sufficiency of Evidence.** In an action by a husband for divorce, prosecuted on the theory that, after he had wrongfully abandoned his wife, the latter refused an offer he made to become reconciled and live together thereafter, evidence *held* to show that the wife did not refuse a proper offer of reconciliation a year before the suit was brought, and that, therefore, she was not guilty of desertion, under Sec. 2370, R. S. 1909.

5. ———: ———: ———: **Effect of Insincere Efforts.** Where a husband abandoned his wife without cause, the fact that he made insincere offers to effect a reconciliation must be considered in weighing the integrity of subsequent offers made within a year after the abandonment, but does not conclude the matter, since, under the law, the "door of repentance and return" must be kept open to him for a year.

6. ———: ———: ———: **Bona Fides of Efforts.** An offer of reconciliation made by a husband who had abandoned his wife is not to be condemned because made by letters; and the fact that he kept copies of such letters would not conclusively establish that he was insincere in making the offer, although it was a circumstance pointing in that direction.

7. ———: ———: ———: ———. Where a husband, after abandoning his wife without cause, made a sincere offer to take her back, intending, if she accepted, to perform his marital obligations, the fact that the cause moving him to make the offer was a desire to avoid the rendition of a judgment for separate maintenance for the wife in a suit then pending, would not diminish the legal effect of his offer.

8. ———: ———: ———: ———. Where a husband, after abandoning his wife without cause, made numerous efforts to effect a reconciliation, which were rejected by the wife, he was justified in requiring, as a condition of his acceptance of an offer by her to return to him, made shortly before the day a suit for separate maintenance brought by her was set for trial, that she dismiss said suit, and his previous offers to take her back should not be stamped with insincerity because of this insistence.

9. ———: ———: **Efforts at Reconciliation: Effect of Rejection.** Where a husband abandons his wife without cause, his genuine offer to return and renew cohabitation, made before a year elapses, will break the desertion and will prevent the wife's obtaining a divorce on the ground of desertion, under Sec. 2370, R. S. 1909.

10. ———: ———: ———: **Bona Fides of Efforts.** Where a wife, whose husband abandoned her, instituted suit for separate maintenance, alleged offers in her motions for attorney's fees,

that she was at all times ready to resume marital relations, not being made as offers but as excuses for demanding money, should be disregarded in determining whether or not the husband had made a genuine effort to effect a reconciliation, so as to defeat the wife's action for divorce on the ground of desertion.

11. ———: ———: Effect of Acquiescence. A husband's wrongful abandonment of his wife does not constitute desertion, under Sec. 2370, R. S. 1909; if, within one year thereafter, she showed by her words or conduct that she acquiesced in the separation.

12. ———: ———: Efforts at Reconciliation: Effect of Rejection. Where, prior to a husband's wrongful abandonment of his wife, he had not been guilty of conduct justifying a divorce, the wife could not refuse to accept genuine offers made by him to effect a reconciliation because of his conduct prior to the separation, and she could not, by remaining away from him, as a consequence of such refusal, create a right to be divorced on the ground of statutory desertion.

13. ———: ———: ———: ———. In an action for divorce, held that the evidence showed that the husband, within one year after he had wrongfully abandoned his wife, had made a genuine offer to effect a reconciliation and renew cohabitation with his wife, and that she refused his offer, and hence it is held that the wife was not entitled to a divorce on the ground of desertion, under Sec. 2370, R. S. 1909.

14. ———: ———: Effect of Acquiescence. In an action for divorce, held that the evidence showed that, within one year after her husband had wrongfully abandoned her, the wife showed by her conduct that she acquiesced in the separation, and hence it is held that she was not entitled to a divorce on the ground of desertion, under Sec. 2370, R. S. 1909.

Appeal from Pike Circuit Court.—*Hon. W. T. Ragland*, Judge.

REVERSED AND REMANDED (*with directions*).

*Barclay, Fauntleroy & Cullen* and *Fry & Rodgers* for appellant.

(1) The review of a suit for divorce on appeal is governed by the rules applicable to equity cases and extend to the law and the facts. Schuman v. Schuman, 93 Mo. App. 99. (2) The decree in favor of defendant granting a divorce to her ought not and

cannot stand because her refusal when requested to live with appellant constitutes consent on her part for appellant to live apart from her, and she cannot be heard to say he deserted her. Youngs v. Youngs, 78 Mo. App. 225; Droege v. Droege, 52 Mo. App. 84. (3) When a wife remains away from her husband without his consent, and upon his request made in good faith for her to return and live with him, refuses to do so, she is not entitled to a divorce on the ground of desertion. Schuman v. Schuman, 93 Mo. App. 104; Louis v. Louis, 134 Mo. 566; Thomas v. Thomas, 152 Ill. 577; Hair v. Hair, 10 Rich. Eq. 163; McMullin v. McMullin, 123 Cal. 653; Schroeder v. Schroeder, 26 Ill. App. 524; Kenley v. Kenley, 3 Miss. (2 How.) 751; Briggs v. Briggs, 24 S. C. 377; Crow v. Crow, 23 Ala. 583; Jerolaman v. Jerolaman, 54 Atl. (N. J. Eq.) 166; Hanberry v. Hanberry, 29 Ala. 719; Fellows v. Fellows, 31 Mo. 342; Hooper v. Hooper, 24 N. J. Eq. 93; Whelan v. Whelan, 183 Pa. 293; McGowan v. McGowan, 50 S. W. 399; Gilbert v. Gilbert, 5 Misc. Rep. 555, 26 N. Y. Supp. 30; Chipchase v. Chipchase, 48 N. J. Eq. 549; Provost v. Provost, 63 Atl. (N. J. Eq.) 619. (4) The refusal of respondent to live with appellant was unjustifiable and continuous for more than a period of one year before the filing of his petition for divorce. This entitled him to have the prayer of his petition granted. Ashburn v. Ashburn, 101 Mo. App. 365; Louis v. Louis, 134 Mo. App. 566; Schuman v. Schuman, 93 Mo. App. 99; Messerger v. Messerger, 56 Mo. 329; Neilson v. Craig, 175 Mo. l. c. 405; Hooper v. Hooper, 34 N. J. Eq. 93.

*D. A. Murphy* and *Clarence A. Barnes* for respondent.

(1) The appellate court gives due weight to the findings of fact by the trial court in divorce cases, even though expressed by a general conclusion. Schuman

v. Schuman, 93 Mo. App. 99. When one suing for a divorce proves facts entitling her to a divorce, the court has no power or discretion to deny it. Meyer v. Meyer, 158 Mo. App. 299; Hamburg v. Hamburg, 147 Mo. App. 591; Ryan v. Ryan, 156 Mo. App. 655. (2) The circuit court has properly granted a divorce to respondent on the ground of abandonment and desertion, because it is expressly admitted in all of his evidence by appellant himself and on the very date appellant has contended he was seeking a reconciliation, he then had pending in the circuit court of Audrain county a petition asking that he be decreed a divorce and his purported overtures, visits, copied letters and post cards, were properly found by the trial court not to have been made in good faith, and for the purpose of effecting a reconciliation. Parker v. Parker, 42 Atl. 160; McKean v. McKean, 5 Atl. 799; Olcott v. Olcott, 26 Atl. 469; Musgrave v. Musgrave, 39 Atl. 961; Johnson v. Johnson, 16 N. E. 891; State v. Williams, 136 Mo. App. 304. (3) The record in this case nowhere shows respondent refused to accept an offer made in good faith to live with appellant, but on the contrary shows that when she was deluded into believing that an offer had been made in good faith, she accepted the caresses of appellant, and was ready and would have accepted a sincere offer in good faith to return to him. But a mere offer to live with respondent and support her does not entitle appellant to a decree for divorce and bar respondent's cross-bill because neither respondent nor the courts are required to believe that such an offer was sincere. Porter v. Porter, 44 N. E. 740; Wilson v. Wilson, 67 Ill. App. 522; Spengler v. Spengler, 38 Mo. App. 266; Louis v. Louis, 134 Mo. App. 566.

STATEMENT.—Suit for divorce, wherein plaintiff was denied a divorce and defendant was granted one

under the testimony on her cross-bill, with $2500 alimony in gross. Plaintiff has appealed.

The statutory grounds for divorce stated in the petition are (1) that defendant absented herself without a reasonable cause for the space of one year; (2) that she offered such indignities to plaintiff as rendered his condition intolerable, particularizing. In her cross-bill, defendant states against the plaintiff the statutory ground of offering her such indignities, etc., particularizing. She also makes an allegation, which the trial court treated as a sufficient charge, that defendant absented himself without reasonable cause for the space of one year, as follows: ''That plaintiff disregarding his duties as the husband of the defendant, did on or about the 21st day of July, 1909, without any cause or excuse whatsoever, and against the desire and without the consent of defendant, deserted and abandoned defendant, and since said date has ever failed, neglected and refused to support and contribute to the support and maintenance of defendant and to make any provision therefor, other than to permit her to occupy one of his tenement houses and a special allowance provided for a short period of time by the court in a former and other cause.''

With a view to determining whether it justifies the decree, we have carefully examined the evidence, which occupies over six hundred and sixty pages of the printed abstract. As a result thereof, we adopt certain of the findings of fact embodied in the decree of the circuit court, as follows:

''The court finds that plaintiff and defendant were married at Mexico, Missouri, on the 17th day of April, 1907, and continued to live together as husband and wife from that date until the 21st day of July, 1909. That plaintiff and defendant from the date of their marriage until the latter part of January, or first of February, 1909, faithfully demeaned themselves and that each treated the other with kind-

ness and affection. That during the latter part of January, or first of February, 1909, for some reason not disclosed by the evidence, a coolness sprang up between them and their relations became estranged and from that time on until their separation on the 21st day of July, 1909, there were mutual acts of retaliation and recrimination tending to alienate and destroy their mutual affection; but the court finds that all of the acts and conduct on the part of each of them whether taken singly or together, did not constitute such indignities as to render the condition of either of them intolerable within the meaning of the statute so as to entitle either of them to a divorce on the ground of indignities alone. The court further finds that from the date of the marriage of plaintiff and defendant until the 16th day of July, 1909, they lived in a large and well-furnished residence located in a desirable residence district in the city of Mexico, Missouri. That on the 16th day of July, 1909, the plaintiff, with the intention of getting defendant out of his home and with the intention of abandoning her, after having so done, furnished a small house in a different part of said city of Mexico and removed his family, including plaintiff, thereto. That on the 21st day of July, 1909, and without any change in the general relations then existing between plaintiff and defendant and without any previous notice or warning to defendant, plaintiff without legal cause or excuse deserted defendant and on the same date instituted in the circuit court of Audrain county, Missouri, his suit for divorce."

We may, at this point, add to the foregoing, that the divorce suit last mentioned was voluntarily dismissed by the plaintiff on the 29th day of September, 1909, on which day the plaintiff had offered to resume marital relations with the defendant. On November 9, 1909, the defendant instituted a suit for separate maintenance in the circuit court of Audrain county,

Missouri, which said suit was pending and undisposed of until November 9, 1910, during which time, however, and thereafter, from time to time, the plaintiff made offers of reconciliation and to resume marital relations with the defendant, which she did not accept or act upon.

The only question which we deem necessary to consider at greater length in this opinion is whether either of the parties is entitled to a divorce on the ground of desertion. That depends upon the sincerity of plaintiff's offers of reconciliation, and upon whether, by her words or conduct, subsequent to his leaving her, she acquiesced in the separation continuing. In these respects the evidence discloses the following facts:

On September 29, 1909, while his first divorce suit was pending, the plaintiff called at the defendant's house. A Mrs. Tucker was there talking to the defendant. She had come before she had her breakfast, though she lived about four blocks away, and she stated that fact to defendant. It appears to have been the first time plaintiff called since he left his wife. Prior to that time all his efforts seem to have been directed toward procuring a dissolution of his marriage. Whether he and Mrs. Tucker met there by prearrangement so that she might serve as a witness is a question. Plaintiff and Mrs. Tucker testify that, on the evening before, he had asked her to call for the purpose of ascertaining whether his wife would talk to him. They both assert that neither had any idea of finding the other there. She says that she called twice the evening before and failed to find defendant in. Defendant testifies, in effect, that Mrs. Tucker did not make those two calls; that she was home at the time they were said to have been made. Plaintiff does not explain why he did not postpone his visit until he heard finally from Mrs. Tucker as to his wife's willingness to talk with him.

Defendant's version of what occurred on this occasion is as follows: Mrs. Tucker told her that plaintiff had been to her (Mrs. Tucker's) house the night before and wanted to know if defendant would have a talk with him. Defendant said, "I don't know, I haven't really recovered from the way Mr. Creasey has done me to have a talk with him." Then, seeing her husband approaching the house, she said to Mrs. Tucker, "There comes Mr. Creasey and I don't feel like I want to talk with him yet awhile." Mrs. Tucker answered, "If I didn't want to see him I wouldn't go to the door." She did not go to the front door when he rang the bell and he came around to the kitchen door and asked her if he could come in. She told him it was his house. He came in and said, "Mamma, I have come to have a talk with you. I want you to forgive this and let's go back." He threw his arms out to her saying, "Mamma, I have come to acknowledge I have done wrong, come to my arms and let me hug and kiss you." She answered, "Mr. Creasey, I can say to you as you said to me time without number, that you need not come to me." Then he said, "Now you see Mrs. Tucker." Defendant said, "Now you see Mrs. Tucker, wasn't there a plot you two should meet here this morning?" Mrs. Tucker said "Oh, no." He then said, "Mamma, your nieces are coming this month, I want you to come back home with me to the big house so we can entertain her in the big house." She answered that her niece would be entertained wherever she was. Then he said, "Come on, quit your foolishness." She answered that there was no foolishness with her; that she could not forgive yet; that she would have to have time. He asked her how much time. She said all that she wanted; that he had caused a wound in her heart it would take a long time to heal; that he had not only humiliated her but her father by having him arrested. Then she turned to him and said, "What would you give to have me back?" He

pointed to his breast and she answered, "Oh, is that all? Mr. Creasey, should I come back to you, you will have to meet conditions that you don't think you will have to meet." She says that ended the interview.

Plaintiff testified as to this first alleged attempt to effect a reconciliation, that when he came into the house he told her he wanted to have a talk with her; that he saw she had company there and that he wanted to talk to her alone. That she said, "No, she wanted a witness." "Very well," he said. Then followed his version of the conversation which is, in substance, like hers, except that he says she told him he would have to deed her enough property to keep her as long as she lived. Mrs. Tucker's testimony corroborates his. We may add here that when plaintiff's suit for maintenance came on for trial Mrs. Tucker appeared as a very friendly witness to plaintiff, having come voluntarily from Denver, Colorado, where she was then living, for the purpose of testifying on his behalf. It may also be said that before she went to Colorado her conduct, if defendant's testimony is to be credited, savored of intermeddling in the affairs of this couple.

Plaintiff caused his then-pending divorce suit to be dismissed on that day. Defendant heard of this in a day or two. The divorce suit was then reinstated at her instance in order to have her motion for attorney's fees, which was pending at the time of the dismissal, passed on. It was then finally dismissed. He does not appear to have communicated further with his wife until October 28, 1909, when he sent her a letter by registered mail. It was excluded from evidence on the ground that it was a privileged communication, and it is not preserved in the record.

Plaintiff testifies that he sent Will Steele, her intimate friend, to see her. In his answer filed in the maintenance suit plaintiff states that he sent a friend of hers and his, referring, we infer, to Steele, "to get

her decision,'' meaning her decision on his offer made
in the presence of Mrs. Tucker. Defendant admits
that in the winter or fall of 1909, Steele spoke to her
about returning to her husband, but says that when
she asked him if he had been sent to see her, he said,
''No.'' What she said to Steele is not disclosed.

She filed her suit for maintenance on November
9, 1909. In his answer, filed in that suit on November
30, 1909, plaintiff admits that he had brought suit
against her for divorce, but charges that it was on
account of ''the acts and conduct of plaintiff.'' He
then sets up his alleged efforts to resume his marital
relations and obligations, and further says: ''And
even now comes defendant and affirms his proffers to
this plaintiff, and agrees to take her back and support
her if she will come and live with him; and that there
is no necessity for her to work for a living, if she has
done so, and no necessity for her to have to employ
lawyers to get her the necessities of life, but that this
defendant is now and has been since first making the
proposition to her, ready, willing and able to take
her back as his wife.'' In her reply, filed June 13,
1910, she stated in response to this renewed offer,
first, that it was not made in good faith; second, ''that
there is such an incompatibility in the temperment,
disposition and purpose in life between the plaintiff
and defendant that a renewal of the marriage relation-
ship would result in a repetition of the same or sim-
ilar indignities stated in the plaintiff's (her) peti-
tion.''

There were two hearings had in the maintenance
suit, the first ending June 15, 1910, and the second
about November 9, 1910. At the end of the first hear-
ing, the court laid over the case or withheld its decision
to give the parties an opportunity to become recon-
ciled. Thereupon plaintiff, the husband, caused his
wife's uncle, J. A. Vaughn, who was friendly to her, to
go and ask her to come back and live with him. This

was in June, 1910. She says that she does not remember what she told her uncle. The uncle testified that she answered, "Not yet, she couldn't." He asked her why, and she said, "You don't know it all, he has even had men to watch my house." (We may say here that this "watching" was done by a deputy sheriff on one occasion at plaintiff's instance to ascertain what lawyer defendant was conferring with. It was not intended as a reflection on defendant's conduct and was not so construed by any one.) Plaintiff testified that he sent defendant's pastor to see her in an effort to have her come back. She admits that the pastor celled and said something about her coming back to her husband. That she said, "Brother Truex, you don't know all, he hired a man to watch me." She testifies that he told her that her husband had not sent him. When the pastor called is not disclosed.

Shortly after the first hearing of the maintenance suit, the plaintiff made a two weeks' visit to Texas. Defendant admits that he called upon her before going, though it is not disclosed what occurred then. While in Texas he wrote her as follows:

"Worthom, Texas, July 10, 1910.
"Mrs. Carrie Creasy,
          Mexico, Mo., .
"Dear Wife in writing you at this time I hardly know how to commence or what to say under the circumstances. Now if I knu you would answer and be nice to me I would surely know better what to say and would feel better about it after I had said it. But I can and do hope for the best this is sunday morning and it is nice and cool and all are well and happy but myself I will go to sunday school as I havent missed a sunday this year this is a fine place good crops and plenty of everything peaches plums in fact fruit of all kinds as well as fried chicken are ripe here and a mocking bird has a nest in fathers yard and the old bird came and sit in a tree close to my bedroom windo

about day light this morning and sang to me for moore than an hour it was just grand and I am sure if you had of been with me you would of enjoyed it too. and I am sure it would of sounded much sweeter to me. For you are as usual on my mind all the time I do certainly wish you had come with me as I tried to get you to I am sure we both would be happier at least I know I would and I believe you would for I do not see how you can be happy the way things are now I am sure if you will come back to me and we both drop our past troubles and neither one of us never mention the past troubl to the other I am sure we can always get along and be happy for ever. Now don't you think so? Now write and tell me yes and that you will come to me for in spite of all that has been done and said I still love you. Now you just stop listening to others and come to me and see if I dont do as I said I would do. I hope you have been thinking over the two little talks I had with you before I left Now you would not say if I could come to see you any more or that you would let me in or that you would talk to me if I did come and above all you would not say that you loved me not even a little bit. Now write me at once and say yes I do and will to all of them and I will come to you just as soon as I get to Mexico for I am always lonesome without you and I forgive you for all that has been said or done and I want you to do me the same way I know you said you never would be a wife to me any moore like you had been once but you surely did not mean that Now did you. Please answer this at once and say to me I was only joking and did not mean it Now I could and I would write you a long letter if I only knew you would receiv it in the same spirit of earnistness which it was written and answer it. I know we are not going to live always so let us both live in the future so that when our time does come we will not be ashamed or afraid to go to be judged by him who

will judge all of us according to the deeds done in the body and in closing this letter I want to say to you this much. you are the only little woman in this world I love and the only one I ever expect to love and I want you to believe me in all seariness and write to me so I can get your letter by saturday sure.

"Lovingly yours with many kisses

Mason.

"P. S. I have just been out in the country where they had plenty of watermelons muskmelons and fruit of all kinds We sure had a big time the girls ar canning fruit and making jelly and paservs to beat the band they all live on farms and have plenty of everything My appitite is good and everything tastes good to me I have gained six pounds since I talked with you as there is plenty of melons fruit and fried chickens here I hope to continu to improve in flesh for some time yet. and I believe if you will only write me the right kind of a letter I will get fat I am going south of here next week a few days to look for a new location to go into business and hope to please you what ever I do anyone can do well here if he will only hustle and I always have hustled and can yet if you will love and encourage me for I know you should ayway and belve you will

M "

This she answered as follows:

"Mexico Mo July 13 1910.

"My Dear Husband

"I have received your letter and have read and reread it so often that I can almost quote it, it seems to true that you have already forgotten the way you imposed on me, and I cannot help feeling that like the mocking bird you are writing your lesson in imitation of the bird rather than as the originator of the music.

"I am glad that your health is improving and you are gaining in weight and if you will keep that up for

a fews months longer, and continue you lesson it is possible you may perfect your plans.

"My heart is indeed broken and I feel that I am entitled to your love and affection and would give all the world for it, but somehow my intuition keeps telling me that it would never do, for you, have long since made up your mind to discard and humiliate me.

"I must close for I tremble so as I write this, and I do not want to say anything to discourage either of us in an honest effort to forget our differences.

"Yours in haste
Carrie"

He also wrote to her while there as follows:
"Wortham Tex July 1910
"My Dear Little Wife Mysterious you are still as great a mystery to me as. ever. Now don't you rember back in 1906 before we were married I wrote you a love letter and pictured to you three kinds of trouble 1st the trouble you had already had 2nd the trouble you have and 3rd the trouble you are looking for. Now havent you had trouble enough. I am sure I have. Now it always will be a mystery to me why you turned against me and treated me the way you have I am sure I was good to you and no man ever did love a woman any better and was moore affecionet than I was to you, and I have asked you to forgive me for any thing that I have done that displeased you now it seems you have no love for me at all not even a kind word and all this time you know I do love you with all my heart. Now you said you got my letter but you did not answer it at all you only mentioned the mocking bird Now mama you try it again and see if you cant answer this one with a long letter and tell me I can come and talk with you and you will say something encouragin to me when I do come. Now mama I am sure you will feel better over it if you do. Now you seem anxious for me to stay here several

Creasey v. Creasey.

months longer how can you say that when you know how anxious I am to see and love you. you spoke of the broken heart. yes my heart is broken and all for the love of you and you say you feel you are entitled to my love and effection and would give the world for it. When you know you had it every day yes every minute when you for some unknown reason to me threw it away just as if it was some uncard for toy. and even now when it is being offered to you again you are not only refusing it but seem to spurn it when you know it comes from an honest heart and with all searsness you did not say you would like to be with me or that you would like for me to be with you. I thank you for your prompness in writing me and do hope you will be as prompt in ansuring this one. Now mama as you did not ask me to answer your letter I am taking the liberty just as I did in writing you the first time and hope you will answer this one as promply as you did the other one so you think you could give the world for my love and affection But your intuitions keeps telling you not to except either for it would never do Now you just listen to me and you come to me and stop listening to your intuitions and evry one else and we will both be happier I have always believed it was other talk and influence over you that was the cause of your doing the way you have. and I believe if others would let you alone even now you would come and be the sweet little wife to me you once was oh how I did love you and always will. you say you do not want to say anything to descourage either of us in trying to forget our differences are you trying to forget our difference if you are an honest. effort will clear the way I have already made.

"the honest effort and the way is clear Now forget the past and writ me a long letter. so with lots of love and many kisses for you I am always your affectionally

"MASON."

While in Texas he also sent her a post card, dated July 7, 1910, stating in substance that he had arrived the night before all right and had a nice trip, etc., and ending with: "With love and best wishes to you." Under date of July 13, 1910, he sent her a post card containing the printed words, "I love but thee." From Mexico, Missouri, he sent several post cards to her at Springfield. Among these, one dated August 10, 1910, bore the printed legend, "Please don't keep me waiting." Another, undated, had printed on it, "Some one longs for some one." On this card he wrote, "Better love and lost than never loved at all." Another, dated August, 1910, had printed on it, "If a body write a body and get no reply, may a body ask a body just the reason why?" On September 8, 1910, he sent her a post card from Colorado. About September 21, 1910, he sent her a post card on which was printed, "You're the only girl I ever loved—but I can't keep telling you so, all the time." Across this he had written, "True as gospel." On September 25, 1910, he sent her a post card on which was printed a poem to the general effect that a man was his own best friend and that he should be good to himself. On August 13, 1910, she sent him a postal from Springfield on which was printed, "What's the use of loving if you can't love all the time?" On October 16, 1910, while he was in Mexico, Missouri, he wrote a letter to her, as follows:

"Mexico, Mo. Oct. 16, 1910.

"My Dear Wife

"I hope you will pardon me for taking the liberty of writing you at this time for my thoughts are continually of you. Now I know you do love me. or you would not put your arms around my neck and kiss me so sweetly and so many times and talk so loveing as you did to me last Sunday night.

Now I have told you I would always love. Treat you right and do everything in reason for you go anywhere

with you and that I would take you back here where
I live or I would come to you where you live. Now
what more can I do if you can think of anything
moore please tell me what it is. you seemed just a
little out of humor the other night when I walked home
with you. Now I would like to have one moore pri-
vate talk with you and if I cant induce you to become
reconsiled and live with me I will hafto give up for I
have made so many personal appeals to you to come
back and every time I have had to axcept no for an an-
swer. Now if you will write and tell me I can. I will
come and take you to lodge Tuesday night or I will
take you home from lodge which ever you say   Please
write and tell me if either one suits you. We can then
have a long talk togather and I do hope good results
may follow please answer. Lots of love and many
kisses for you.

Yours

Mason."

Plaintiff kept copies of the letters he wrote to the
defendant. These letters were admitted in evidence
over the objection of the defendant that they were
privileged communications, on the theory that she had
waived the privilege by withdrawing the objection to
them at the trial of the maintenance suit. In addition
to sending her these letters and post cards, he went to
her house to talk to her fifteen or twenty times. On
the objection of her counsel that it was a privileged
communication, plaintiff was not permitted to give his
version of what was said at these interviews. She also
wrote him several letters, which were not permitted
to be introduced in evidence because of the same ob-
jection advanced by her counsel. However, in her tes-
timony she admits that on November 5, 1910, "He had
been coming down there for months for me to go home
with him," that is, since in June, 1910. Being asked
by her counsel what plaintiff said to her when he
came to see her, she said, "Well, he would say come

on and go with me or let me stay with you." The Court: "And you declined, you refused to do that? A. No, I didn't come right out and refuse." There is no doubt, however, that she did not go back. She admits that at the time of the first hearing in the maintenance suit she could not see her way back to her husband, stating that this was because he treated her so cool when she "offered to return."

It does not appear that she had ever offered to return except that her attorneys, in a motion for allowance of costs and attorneys' fees, had stated as "grounds thereof . . . that she willingly forgives the defendant (now plaintiff) for those unhappy differences which impelled her maintenance of the present suit, and purposes to faithfully discharge all of her duties as the wife of defendant." (The court had already allowed her attorneys $150 as a fee.) After the first hearing of the maintenance suit, and while the plaintiff was endeavoring to effect a reconciliation with her, her attorneys filed another motion in said suit which stated "that an honest effort is being made by plaintiff to secure an amicable adjustment of the differences now existing between the plaintiff and defendant, . . . that in order that the question of costs in this case up to the present time and the fees of the attorneys therein may not be in any manner construed as operating in restraint of an amicable adjustment of said matters between the parties, the said attorneys respectfully ask the court" to allow the costs theretofore asked for and $750 attorneys' fees, and require the defendant (now plaintiff) to pay the same forthwith.

On October 6, 1910, both the parties went to Springfield, Illinois, to attend the State Fair. She had previously told him that she was going. Though they went on the same train, they did not go in each other's company. He went alone; she went in the company of two ladies, one a Mrs. Botkins. Arriving at Spring-

field, he twice in the railroad station tried to get her to go with him to his sister's, who lived in Springfield, with whom they had stayed on a similar occasion two years before. She told him that the ladies were with her. He suggested that they go too, his sister having plenty of room. She refused. The next day he met her and her party at the fair grounds and talked to her again. While talking to her, Mrs. Botkins came up and said, "Mrs. Creasey are you going with Mr. Creasey or with us," to which she answered, "I am going with you." Mrs. Botkins then said, "If you are going with us come on, and if you are going with Mr. Creasey let him take you like a man." Plaintiff said, "That's exactly what I am trying to do." Defendant would not go, though, she says, when he made these advances he was pleasant and gallant. She did say, however, that though he asked her to go with him to his sister's that night, he did not then ask her to come and live with him again.

She says that after the Springfield incident and before the maintenance suit was finally determined, he came to see her at least on two or three different occasions, spending as much as an hour alone with her. A single isolated instance of her personally offering to go with him is testified to by defendant as having occurred on November 5, 1910, four days before the maintenance suit was to be called for final hearing, and about 9:30 o'clock at night. She told the story of that night under the assumption that all she told occurred in the presence of her boy and then disclosed that nothing was said in the presence of the boy except that plaintiff shook his finger in her face and said, "Not until you promise me you will go with me Monday morning." Going to the door then, he kissed her and said, "Goodbye, I will be here Monday morning." The trial judge then indicated that he would consider only the fragment of the occurrence which the boy is said to have witnessed, following the theory

which defendant had invoked, that overtures for re conciliation not made in the presence of a third person were privileged communications. We will, however, mention the excluded story here. She states that she offered to go home with him that night. At first he hesitated, asking her what made her take the notion. Then he said, "all right," he'd go and see that the house was prepared for her coming. He returned in about fifteen minutes and asked her whether she would go with him Monday morning to get the records clear of the maintenance suit. This she refused to do, and then he would not take her unless she would promise, which she would not do. Asked on cross-examination why she refused, she said that she "owed the man no promise." She did not explain how he came to kiss her good-bye and to promise to be back for her Monday, immediately after reaching this unpleasant deadlock. Plaintiff, on cross-examination, denied the occurrence and says that she only offered to go providing he "did certain things."

The separate maintenance suit was decided against the wife on November 9, 1910. Thereafter on three occasions plaintiff tried to talk with his wife and she avoided him. Once he called at her house and she did not come to the door, though the indications were that she was in. He waited and tried to speak to her on the street as she came out of the house, but she passed on and refused to talk to him. Another time she avoided him when he asked to walk home from church with her. In the meantime she appealed from the judgment against her in the maintenance suit. We decided that appeal at this sitting. [See Creasey v. Creasey, 168 Mo. App. 98, 151 S. W. 215.] He filed this suit for divorce on December 14, 1910.

CAULFIELD, J. (after stating the facts).—We approve of the action of the trial court in denying plaintiff a divorce. It is conceded that the plaintiff

left his wife voluntarily, and the trial court has found that neither party had been guilty of misconduct sufficient to constitute a cause for divorce, a finding which we approve. It was incumbent upon him, then, if he would justly charge her with statutory desertion, to seek a reconciliation and offer to return. Such an offer must have been made in good faith, that is, with the bona fide intention to bring about a reconciliation and not merely as a device to defeat her in litigation. [Nelson on Divorce and Separation, sec. 73; Messenger v. Messenger, 56 Mo. 329.] If the plaintiff made such an offer in good faith and she refused and her refusal continued for the statutory period of one year, he would be entitled to a divorce; not otherwise. She must be taken under the circumstances to have been absent by his consent until he offered to return or take her back, and she must have been absent without his consent for the full period of one year before she became guilty of statutory desertion.

Now we are not satisfied from the evidence that, from July 21, 1909, when he left her, until in June, 1910, when the maintenance suit was first heard, he made any offer with the bona fide intention to bring about a reconciliation; at least we are not inclined to disturb the finding of the trial court in that respect. During this period of more than eleven months, he made but four offers, of which only two may be considered as such. The one said to have been embodied in the letter sent by registered mail must be disregarded because that letter is not preserved in the record and we have no means of judging of its value or effect as an offer. The one said to have been sent through Mr. Steele cannot be regarded as an offer because it was not transmitted to the defendant as such. Steele told her when he called that plaintiff had not sent him. This leaves but two—the one made in the presence of Mrs. Tucker and the one made in plaintiff's answer in the maintenance suit. When the first

was made, the relations between the parties were nec-
essarily strained. For several months they had lived
jarringly together. He had then left her without warn-
ing. For three months his divorce suit had been pend-
ing and he had been vigorously endeavoring to obtain
a dissolution of the marriage. That suit was still
pending when he called. It was a delicate matter for
these two to meet in an attempt to restore a broken
home; not a matter for a third person to witness. The
presence of a third person was not calculated to relieve
the strain or to allow of the frank, free avowals, con-
fessions and discussions so necessary to a successful
reconciliation. Plaintiff must have known this, but
nevertheless Mrs. Tucker was present, and there is
some reason to believe that she was there by his con-
nivance. Be that as it may, it was clearly divulged
to him on this occasion that his wife believed that Mrs.
Tucker was there by his prearrangement, and that she
had considerable reason for so believing, Mrs. Tucker
having called before her (Mrs. Tucker's) breakfast,
avowedly to deliver a message from him coincidently
with his first visit of ostensible conciliation. This visit
was clearly timed most unfortunately, and, as he must
have known, was more calculated to arouse suspicion
and resentment in his wife than a spirit of concilia-
tion. If he had been genuinely desirous to effect a
reconciliation at this time, it seems that he would soon
have followed this visit up with an offer made under
more auspicious circumstances. He was silent for a
month, when he registered a letter to her. This but
tends to confirm the impression that he was trying
merely to make evidence, not to effect a reconciliation.
Thereafter he did nothing by way of communicating
with his wife, except that he says he sent Steele to see
her and except for his answer in her suit for separate
maintenance. As to his sending Steele, it does not
appear that he sent Steele to plead with his wife on
his behalf or to make her any offer, but merely to

Creasey v. Creasey.

"get her decision" in response to his offer made in the presence of the witness, Mrs. Tucker. Besides the fact that he sent Steele is established only by his own uncorroborated testimony, which is in the face of the fact Steele disclaimed to her being sent by him. Steele was not called on as a witness. We see no reason for disagreeing with the trial court's conclusion that the offer made in the presence of Mrs. Tucker was made with a view to its being rejected and not accepted; as a mere device to aid him in litigation, not with a bona fide intention to bring about a reconciliation.

The offer which he made in his answer in the maintenance suit is even more subject to objection. Presumptively it was addressed to the court and was intended primarily to defeat her action for separate maintenance. Necessarily it was not couched in terms of entreaty or persuasion, but was cold and formal, promising and asking nothing by way of forgiveness. It was accompanied by the charge that his previous suit for divorce was brought on account of "her acts and conduct," thus, by implication at least, repeating his prior accusations. It was calculated to embitter rather than to conciliate.

It is clear, then, that the defendant did not refuse a proper offer of reconciliation a year or more before this suit was brought and therefore was not guilty of desertion under the statute and the plaintiff is not entitled to a divorce.

Thus far we find ourselves able to agree with the learned trial court. We cannot agree that the defendant is entitled to a divorce as the court decreed. First, because we do not believe that under the evidence the efforts of her husband, after the first hearing in the maintenance suit, to effect a reconcilation, should be denounced as insincere; and second, because we are satisfied that subsequently to the original separation

and within one year thereafter, she showed by her conduct that she acquiesced in the separation.

As to the first, we may say here that the fact that plaintiff had previously made insincere offers must be considered in weighing the integrity of his subsequent ones, but it does not conclude the matter. The ''door of repentence and return'' must have been kept open to him for a year, under the law. Now we find that, at the end of the first hearing in the maintenance suit, the trial judge (not the one before whom this case was tried) laid the matter over to give the parties a chance to become reconciled, the evidence no doubt suggesting to his mind the propriety and expediency of such a course. We find the plaintiff then resorting with a surprising, though commendable, persistency to all the known modes of effecting a reconciliation. The most that may be said against his sincerity in these subsequent attempts is that he kept copies of the three letters which he wrote. As to the offers contained in these it may be said that he wished to preserve evidence of them for use in the then-pending litigation. This was not, conclusive that they were insincere, though it was a circumstance pointing in that direction. It well may be that he made the offers in good faith, intending to perform them if accepted, though at the same time desiring to place himself in the right in case she refused, by preserving evidence of his offers. The defendant was not advised that he kept copies, so his action in doing so could have had no effect on her, and was not calculated to influence her to reject them. The trouble with his previous offers had been, that they were made under circumstances not calculated to lead to their acceptance. Not so with those embodied in these letters. The letters are framed in the language of entreaty and persuasion, and, considered as offers of reconciliation, appear to be unexceptionable. To communicate with her by letter was not improper. Indeed, that method of communication

is much to be commended, because it gave him an opportunity to express himself calmly and deliberately and gave her an opportunity to consider his offer, without the embarrassment and possibility of renewing the old quarrel, which might attend a personal visit. We are not inclined to view the offers contained in these letters as being insincere, and are fortified in that view by the evidence of the other offers which he made. His persistent following up of those letters with personal visits dispels any doubt in our minds of the sincerity of the offers they contained. The offer which plaintiff made through defendant's uncle was, it is true, made through a third person, who might be, and in fact was, used as a witness, but he was so friendly and close to defendant that it is improbable that plaintiff would have chosen him as a vehicle through which to convey a fraudulent and insincere offer of reconciliation. To communicate with her through her near and friendly relative was certainly unobjectionable and was calculated to conciliate. The other offers which plaintiff made personally are not subject to the objection that he preserved evidence of them. Defendant herself testified that on November 5, 1910, "he had been coming down there for months for me to go home with him,"—that is, since June. He had no witness on those occasions and did not try to have any. He made those offers privately and nothing is suggested which affects their sincerity. It is the same with the post cards, which, though not offers, tended in that direction. He kept no copies of them. As we have already intimated, the very number of offers which this plaintiff made after the first hearing in the maintenance suit impresses us with their sincerity. Plaintiff forcefully exclaimed in his examination in the maintenance suit, "Do you suppose I would have gone down after this woman as many times as I have an l talked to her the way I have and not take her back; would you have gone after anybody as many times as

I have and her sit there and say, 'No, no,' every time; would you have gone back like I have if you wasn't sincere? No, you wouldn,'t, and no other man.'' This expresses our impression exactly. It is inconceivable that if he was then intending formal, insincere offers to take her back, the man would have so persisted, and would have resorted to so much repetition.

It is possible that 'the cause immediately moving plaintiff to endeavor to effect a reconciliation was the pendency of the suit for separate maintenance and the desire on his part to avoid a judgment coercing from him performance of the duty to support his wife. That does not diminish the legal effect of his offers to take his wife back, if he made them with the purpose of having her accept them if she would, and with intent, if she accepted, to take her back and treat her with kindness and respect and to perform his marital obligations. ''No higher motives than those of convenience, it unfortunately must be allowed, have both induced and preserved multitudes of matrimonial unions.'' [McMullin v. McMullin, 123 Calif. 653, 656.] In this case, as we have already indicated, we are satisfied that his offers were sincere, at least in the sense just mentioned, though by no means do we believe that that was the only sense in which he was sincere.

As to the alleged incident of November 5, 1910, when she says she offered to go back to him and he refused, nothing but a fragment of it is disclosed, if we observe the rule by which the case was tried. It is improper to consider that mere fragment without the explanatory matter which preceded, or to consider the explanatory matter now, when the parties treated it as inadmissible at the trial. However, if we consider her version of the whole incident, what does it amount to? Almost on the eve of the resumption of the trial of the maintenance suit, at 9:30 o'clock at night, after refusing for months to go back to him,

she suddenly offers to do so. After expressing some curiosity at her sudden change of front, but willingness to receive her, he asks if she will promise to clear the record of the maintenance suit—that suit in which they had already undergone one long, hotly-contested trial and were immediately threatened with another; in which her attorneys had a motion then pending for $750 attorneys' fees additional to the $150 they had already received, and she was demanding an allowance for separate maintenance. She refused to promise to dismiss the suit and he refused to take her back until she would promise to do so. She now claims that she "owed the man no promise." We are of the opinion that she did. By her constant refusals to go back to him she had by this time put herself in the attitude of the wrongful absentee, and it was incumbent upon her now to make a proper and sincere offer, and an offer coupled with a refusal to abandon the litigation and to live in peace with him was not sufficient. [Jenkins v. Jenkins, 104 Ill. 134.] And plaintiff's many previous offers to take her back are not to be stamped with insincerity because, when she finally consented, he insisted that she dismiss the litigation and live with him in peace. It was not improper that he should wish to get at least her promise to abandon the litigation against him before undertaking the difficult matter of taking up their lives together again. Offering peace, he was entitled to a promise of peace, and she is mistaken when she says that "she owed the man no promise." It is to be noted that he did not purpose to delay her coming back until the suit was dismissed, but was willing that she should come back then, though it was late at night, upon her mere promise to later abandon the litigation.

It appearing, then, that this husband repented and made a genuine offer to return and renew cohabitation before the statutory period of desertion was complete, this was sufficient to break the desertion and

is a bar to the wife's suit. Defendant here suggests that, at the trial of the maintenance suit, the husband refused to tell his wife's counsel what he would do in the matter of taking his wife back, saying in substance "that is a question for the future." We passed on that feature of the case in the maintenance suit, resolving that such answer on the part of the husband was more probably due to the fact that he had become aggravated and wroth at plaintiff's counsel and resented the manner of his cross-examination, rather than to a real indisposition to resume his marital relations, especially in view of his testimony as to his endeavors to make up with his wife and his declarations in the prior part of his testimony. [Creasey v. Creasey, 168 Mo. App. 98, 151 S. W. 215. We see no reason for departing from the conclusion then formed. In fact, we are strengthened in it by the showing here, that immediately after the maintenance suit was finally determined in the husband's favor, he thrice attempted to resume negotiations with his wife. As to her alleged offers contained in the motions for attorneys' fees, filed in the maintenance suit, they were not made as offers, but as excuses for demanding money, and were calculated to irritate, without disclosing any conciliatory tendency. They should be disregarded. In saying this we do not mean to reflect upon the merits of those demands nor to impugn the motives of the plaintiff or her attorneys in making them.

The second reason which we have given for denying defendant a divorce is, that subsequently to the original separation and within one year thereafter, she showed by her conduct that she acquiesced in the separation. Although the husband's leaving was wrongful in the first instance, it did not constitute desertion within the meaning of this statute, if the wife by her subsequent words or conduct acquiesced in the separation. [1 Nelson on Divorce & Separation, sec. 91; Davis v. Davis, 60 Mo. App. 545; Droege v. Droege,

55 Mo. App. 481, 486.]   On the occasion of her hus-
band's first offer in the presence of Mrs. Tucker, we
find defendant coldly inquiring what he will give her
to come back and greeting with a scornful, "Oh, is that
all?"—his reference to himself.   She further told him
on that occasion and in the same connection, that
should she come back to him he would have to meet
conditions "you don't think you will have to meet." In
her answer in the maintenance suit, she is not content
with refusing his offer on the ground of insincerity but
goes further and says in response to it that "there is
such an incompatibility in the temperament, disposi-
tion and purpose in life between the plaintiff and de-
fendant that a renewal of the marriage relationship
would result in a repetition of the same or similar
indignities stated in the plaintiff's (her) petition."
It thus appears that, while he was insincere in these
two offers of reconciliation and may be taken to have
desired the separation to continue, she too desired it
to continue.   Where the separation is acquiesced in
by both, neither is entitled to a divorce on account of
it.   When her uncle came avowedly from her husband
with a request for her to return, she answered that
"not yet, she couldn't."   He asked her why and she
said, "you don't know all, he has even had men to
watch my house."   Her letter to him disclosed the
same inclination to bring up, and dwell on, his con-
duct before the separation as a reason for not going
back to him.   If we take her at her own word, it is
clear that she was unwilling to go back to him because
of his conduct before the separation.   As that conduct
was not sufficient to constitute cause for divorce, she
could not, by remaining away in consequence thereof,
"create for herself a cause for divorce, upon the the-
ory that, by so electing to remain away from her hus-
band, he incurs the guilt of deserting her.   If the in-
dignities themselves are not a sufficient cause for di-

168 Mo. App. 7

vorce, a new cause for divorce cannot be extracted from them by the voluntary conduct of the party seeking the divorce.'' [Dwyer v. Dwyer, 16 Mo. App. 422.] Her subsequent failure to go back, in the face of his personal appeals to her to do so, but emphasizes what had already been disclosed, that she was at least as eager to remain away from him as he was to remain away from her. She may have refused his first offers because she did not •believe him sincere, but clearly that was not the only reason. The other reason, we are convinced, is that she did not desire to go back.

The judgment of the circuit court is reversed and the cause remanded with directions to the circuit court to enter its judgment that the plaintiff take nothing by his petition and that the defendant take nothing by her answer; the defendant, however, to have and recover her costs in this behalf expended. The matter of an allowance to defendant for attorneys' fees for services here and in the circuit court, we leave to the circuit court. *Reynolds, P. J.,* and *Nortoni, J.,* concur.