**W. W. CAMPBELL, Plaintiff-Respondent,**

v.

**W. Dorothea CAMPBELL, Defendant-Appellant.**

No. 7346.

Springfield Court of Appeals.

Missouri.

July 28, 1955.

Eugene M. Munger, St. Louis, for defendant-appellant.

R. P. Smith, Cape Girardeau, for plaintiff-respondent.

STONE, Judge.

Defendant appeals from the decree of divorce granted to plaintiff on his petition filed on November 10, 1952, which was predicated on the sole ground of statutory abandonment [Section 452.010] alleged thus, to-wit, "that defendant * * * on or about the * 5th day of November, 1951, did wrongfully and without cause desert and abandon plaintiff, and defendant has wrongfully and without cause absented herself from plaintiff for the space of more than one whole year next before the filing of this petition." (All statutory references herein are to RSMo 1949, V.A.M.S.) Plaintiff and defendant were married at Camp Kilmer, New Jersey, on October 30,

1949. He, then 33 years of age, was a "career soldier" with the rank of Master Sergeant who had been in military service since 1937. She, then 26 years of age, was a telephone operator at Camp Kilmer. Following their marriage, the fourth for plaintiff and the first for defendant, the parties took a trip through Canada, visited at the home of plaintiff's mother in Chaffee, Missouri, where he had maintained his legal residence, and then proceeded to Fort Lawton, Washington, where they lived together until plaintiff went overseas to Japan on March 17, 1950. When plaintiff left, there was no indication that the separation would be a permanent one but the understanding was, as he said, that defendant would join him "at the first opportunity." There is no suggestion of domestic difficulty before plaintiff embarked. After her husband went overseas, defendant returned, with his prior knowledge and consent, to her mother's home at Metuchen, New Jersey, where she has resided since that time.

Army authorization for defendant to join plaintiff in Japan was given in July, 1950, but was cancelled shortly thereafter, when the Korean War broke out. Plaintiff was in Korea about one year. When he returned to Japan in July, 1951, he again requested, "with her knowledge—I don't know if it was with her consent," authorization for his wife to join him. None of the correspondence between the parties prior to November, 1951, is before us, but plaintiff testified that "several times when I was writing her asking her to join me she never said she would or she never said she would not." In any event, plaintiff was one of eighty-nine wives listed in a "travel authorization" issued by the Army on October 1, 1951, which stated that "upon call of the Port Commander, Seattle Port of Embarkation, the * named dependents * * * are authorized to proceed * * * to the appropriate Port of Embarkation as indicated in port call for further movement by water transportation * *." On October 24, 1951, a "port call" was issued for defendant "to report to * * Fort Lawton, Washington * . * * 17 November 1951 for travel to Japan." On October 31, 1951,

the Transportation Officer at Camp Kilmer notified the Commanding General of the First Army, from whose office the "port call" had been issued, that defendant "requests deferment for 30 days at which time she will accept Port Call." During the period of this deferment which was granted, defendant requested a second deferment for an additional period of 30 days which, as she testified, likewise was granted; but, on December 24, 1951, prior to expiration of the second period of deferment, defendant received notice that the "travel authorization" had been "amended to delete" her name "in accordance with message * * from Tokyo Japan dated 8 December 1951." Plaintiff readily admitted that he had requested cancellation of the "travel authorization" for his wife "sometime in November," 1951, after arrival on November 21 of a ship which, as he said, "she could have been on"—a statement apparently predicated solely on the fact that one of the other eighty-eight wives named in the "travel authorization" arrived on that ship. According to plaintiff, an officer asked "whether my wife was coming and said you must state if she is coming or not. We can't hold up the house for you. I was forced to cancel the orders."

Defendant's explanation of her requests for deferment was that her health had "never been the same" after a miscarriage shortly before her husband went overseas; that, although she had returned to work at Camp Kilmer in July, 1950, she had been under medical care "almost continually"; that, about the time she received the "port call" in October, 1951, she "had an acute appendicitis and gall bladder attack"; that her first deferment was granted "because it wasn't safe for me to travel"; that, although her condition responded to treatment and she had no surgery, her health had not improved sufficiently to permit her to travel before the first period of deferment expired; but, that she "had planned on going in January (1952)," before expiration of the second period. Plaintiff complained that his wife had given him no reason for her failure to join him "until it was past the time for her to join me (apparently refer-

ring to November 21, 1951) and then she used the excuse of illness." However, even though plaintiff admittedly heard of the deferments from his wife in "late November," 1951, he made no subsequent effort either to rescind the direction theretofore given by him for cancellation of his wife's "travel authorization" or to arrange for her to join him.

■ To prove desertion, within the meaning of Section 452.010, three elements must be established, namely, (1) cessation from cohabitation without reasonable cause for one year, (2) an intention on the part of the deserter not to resume cohabitation, and (3) absence of consent to the separation on the part of the deserted. Crum v. Crum, Mo.App., 217 S.W.2d 715, 717(1); Parsons v. Albertson, Mo.App., 31 S.W.2d 211(1); Hall v. Hall, 77 Mo.App., 600, 607(2). Both the second and third elements are in dispute in the instant case. Plaintiff's case on the second element rests primarily upon defendant's failure to arrive in Japan on the ship which docked on November 21, 1951; but, upon the transcript presented, we are not satisfied that this fact either compels or reasonably permits the inference that defendant intended not to resume cohabitation with her husband. In the first place, the record does not demonstrate that plaintiff had any reason to expect (if, in fact, he did) that his wife would arrive in Japan on November 21, 1951. As plaintiff readily agreed on cross-examination, the "travel authorization" neither fixed a date for his wife's departure from the United States nor designated the ship on which she might be transported. In fact, plaintiff admitted that he did not know whether his wife "was ever called." And, conceding that, prior to arrival of the ship on November 21, "I had no definite proof whether she would or would not sail," plaintiff did not indicate what "definite proof" he then obtained or had. Since defendant's "port call" requested that she "report to * * Fort Lawton, Washington * * * 17 November 1951 for travel to Japan," and since there was no showing either as to the period of time ordinarily required for passage from Seattle to Yokohama or as

to the date on which the ship, which docked at Yokohama on November 21, 1951, left Seattle, the record before us affords no basis for an inference that, even if defendant had reported to Fort Lawton on November 17, she could or would have been transported to Japan on the ship which defendant met on November 21.

Plaintiff also leans heavily on a letter dated November 1, 1951, from defendant to plaintiff's sister which, as plaintiff urges, indicated defendant's then intention to desert plaintiff, but which, to us, carries no such implication. The burden of defendant's message was that plaintiff "used to be kind, loving and understanding * * * but now he is entirely different—I feel terrible and lost." It is true that defendant also wrote, in complaining tone, that her husband "wanted me to quit my job and go out there regardless of debts or anything else." However, she. pointed out that "If I don't go he can come home sooner but if I go he would have to sign up for another year over there"; and, she also told her sister-in-law that "I haven't been feeling too well either—I had a gall bladder attack and my appendix is trying to make up its mind when it will have to come out."

■ As negativing the idea that defendant intended not to resume cohabitation with her husband, we observe that she neither ignored nor requested cancellation of the "travel authorization" but rather sought two deferments; that she testified positively that "I had planned on going in January (1952)"; and that, even after institution of this action against her, she still wrote her husband at least "occasionally." Furthermore, irrespective of the merits of defendant's explanation (apparently not accepted by the trial court) that she had sought deferments because of her physical condition, whether her failure to join her husband in Japan constituted desertion is open to serious doubt. True, it is the husband's prerogative to select the matrimonial domicile and the wife must follow the fortunes of her husband and must live where he chooses to live [Messenger v. Messenger, 56 Mo. 329, 337(1); Easley v. Easley, Mo.

App., 266 S.W.2d 28, 31(2); Hupp v. Hupp, 238 Mo.App., 964, 194 S.W.2d 215, 219(1)], even as in Biblical times Ruth told Naomi that "whither thou goest, I will go; and where thou lodgest, I will lodge." Ruth 1.16. But, this general rule is not without its limitations, for it has been well-said that, in exercising his right to choose the matrimonial domicile, the husband must act reasonably and not arbitrarily, and must have due regard for the safety, welfare, comfort and peace of mind of his wife. Brackmann v. Brackmann, Mo.App., 202 S.W.2d 561, 567(9); 27 C.J.S., Divorce, § 36b, pp. 564, 566; 17 Am.Jur., Divorce and Separation, Section 106, p. 205. "(I)t may be questioned whether a husband has a right to require his wife to leave all her kindred and friends, and follow him to Greenland or Africa, or even to Texas, Utah, or Arizona." Boyce v. Boyce, 23 N.J.Eq. 337, 348. See and compare Schuman v. Schuman, 93 Mo.App. 99, 105; Haymond v. Haymond, 74 Tex. 414, 12 S.W. 90, 93; Hare v. Hare, 10 Tex. 355, 358; annotation 29 A.L.R.2d 474, 484–485; Kennan on Residence and Domicile, Section 238, p. 444.

As will have become apparent from the foregoing, we are by no means persuaded that the record in this case would permit a finding for plaintiff on the second element of statutory desertion, namely, an intention on the part of defendant not to resume cohabitation with him. Cf. Nicholson v. Nicholson, 214 Mo.App. 570, 264 S.W. 82, 83(2); Boos v. Boos, 88 Mo.App. 530, 533. But, we need not and do not rest disposition of this appeal upon a determination of the issue raised as to the second element, for, in our view of the case, plaintiff clearly failed to establish the third essential element, namely, absence of consent to the separation on his part. In application of the time-honored principle that a spouse, who consents to or acquiesces in separation from the other, may not have a divorce on the statutory ground of desertion [Simpson v. Simpson, 31 Mo. 24; Nolker v. Nolker, Mo., 257 S.W. 798, 803 (8, 9); Price v. Price, Mo.App., 281 S.W. 2d 307], it has been said that, even though a spouse may not have had just cause to have absented himself or herself from the other, and even though the deserted spouse may not have consented to separation in the first instance, nevertheless the absence does not constitute abandonment and will not ripen into statutory desertion if the deserted spouse, within the statutory period of one year, acquiesces in the separation. Nicholson v. Nicholson, supra, 264 S.W. loc. cit. 85(8); Creasey v. Creasey, 168 Mo.App. 68, 151 S.W. 219, 227–228 (6, 8); Davis v. Davis, 60 Mo.App. 545, 554–555(1); Droege v. Droege, 55 Mo.App. 481, 486.

The fact that plaintiff neither sought nor evidenced any interest in reunion or reconciliation with his wife subsequent to his letter of November 2, 1951, is a circumstance indicative of his acquiescence in separation. Walthen v. Walthen, 101 Mo. App. 286, 73 S.W. 736; Boos v. Boos, supra, 88 Mo.App. loc. cit. 533; Rodgers v. Rodgers, 84 Mo.App. 197, 199; Droege v. Droege, supra, 55 Mo.App. loc. cit. 485; Gilmer v. Gilmer, 37 Mo.App. 672, 675; Dwyer v. Dwyer, 16 Mo.App. 422, 424. But, we are not dependent upon circumstance or inference, for direct and positive proof is afforded by the only two of plaintiff's letters offered in evidence, which eloquently bespeak his attitude toward his wife and separation from her. In his air mail letter of November 2, 1951, he told her, "I guess we might as well face it—something has happened to our marriage. I don't feel that I'm to blame either, and I'm not going to worry about it. If things don't improve you have lost your husband and I am serious about that." After expressing doubt that defendant loved him "any longer," plaintiff continued, "I'll get by on my own—with a little help on the side and that won't be a problem over here. One can get so much help here that one can be quite particular—downright choosy in fact!" His closing comment was that "maybe it is a good thing that you are not coming—I would be too busy to be a good husband anyway!" Although *why* he so thought is not disclosed by the record, plaintiff apparently had concluded on November 2, 1951, nineteen days before his subsequently-

professed surprise and disappointment that his wife was not on board the ship which docked on November 21, ·that she was not coming to Japan; and, his ·expressed reaction had been that "maybe it is a good thing" and that "with a little help on the side," which he assured her would be no "problem," "I'll get by on my own." To put it mildly, plaintiff's remarks obviously were not designed to encourage ·his wife to quit her work, leave her kindred and friends, and travel half-way around the globe to place herself at his mercy and disposal.

■ Any vestige of doubt as to plaintiff's complete acquiescence in separation from his wife is removed by the last letter he wrote her, which was dated November 4, 1952, *within the statutory period of one year relied upon in his petition.* In that letter, plaintiff wrote, "Dotty, how are you going to react to my applying *to* a divorce? I just cannot see any sense in our trying anymore. I don't expect anything but my freedom * * * I just want you to let me be and let me go in peace." In his concluding paragraph, he expressed the "hope that you agree to the divorce." Thus plaintiff, indicating an easy familiarity with divorce no doubt bred of his not inconsiderable experience in that field, not only acquiesced in separation from his wife but also boldly sought to persuade her to agree that it should be made permanent.

■ A party seeking a divorce must establish by a clear preponderance of the evidence [England v. England, 225 Mo.App. 725, 39 S.W.2d 429, 434; Esworthy v. Esworthy, 223 Mo.App. 171, 11 S.W.2d 1078, 1082(4); Mahn v. Mahn, 70 Mo.App. 337, 340] that he or she is the *innocent and injured* party [Simon v. Simon, Mo., 248 S.W.2d 560, 562(1)], and it is doubly true today, as was well said two generations ago,

that "(i)n the interest of society, courts should not, as they are often asked to do, grant divorces for 'trifles as light as air.'" Van Horn v. Van Horn, 82 Mo.App. 79, 82. We are not unmindful that our appellate review de novo in this divorce suit should be with due regard to the opportunity of the trial court to judge of the credibility of the witnesses and that the decree nisi should not be set aside unless clearly ·erroneous. Section 510.310; Noll v. Noll, Mo. App., 277 S.W.2d 853(1); Wright v. Wright, Mo.App., 239 S.W.2d 765, 766(2). But, although we should be and are inclined to defer to the findings of the trial court where sharply conflicting evidence does not preponderate one way or the other [Luckett v. Luckett, Mo.App., 263 S.W.2d 41, 44(4)], such findings are in no wise ·binding upon us [Easley v. Easley, supra, 266 S.W.2d loc. cit. 31(1)] and we cannot abdicate our responsibility to try the cause anew and to enter such judgment as in our opinion the evidence demands. Clemens v. Clemens, Mo., 235 S.W.2d 342(1); Cody v. Cody, Mo.App., 233 S.W.2d 777, 780(2, 3). Entertaining the highest respect for the capable trial judge, we nevertheless would be recreant to our trust if we yielded our firm convictions simply because he, upon the same state of facts, found differently. Bassett v. Bassett, Mo., 280 S.W. 430, 437–438; Tebbe v. Tebbe, 223 Mo.App. 1106, 21 S.W.2d 915, 918; Needham v. Needham, Mo.App., 299 S.W. 832, 835.

Being convinced, as we are, that plaintiff did not establish his only pleaded ground of divorce, i. e., statutory desertion, the decree of divorce to him is set aside and the cause is remanded with directions to dismiss his petition.

McDOWELL, P. J., and RUARK, J., concur.