Joseph L. PARENTEAU, Appellant,

v.

Rosemary PARENTEAU, Respondent.

No. 7608.

Springfield Court of Appeals.

Missouri.

Oct. 5, 1957.

Thomas A. Shockley, Waynesville, for appellant.

E. Wayne Collinson, Chinn & White, Turner White, Sam E. Overfelt, Springfield, for respondent.

McDOWELL, Presiding Judge.

Plaintiff appeals from final judgment of the Circuit Court of Pulaski County, Missouri, denying him a divorce on his petition filed July 2, 1956, which was predicated on the ground of abandonment.

The petition alleged that on June 9, 1945, plaintiff was lawfully married to defendant and lived with her until on or about May 1, 1954.

It stated that on April 14, 1955, plaintiff was sent to Fort Leonard Wood, Missouri, by the Army; that he requested defendant to come and live with him but she refused; that she told him she was no longer interested in continuing their marital relationship, and because of such refusal, defendant is now guilty of abandoning the plaintiff for the space of more than one year next before the filing of the petition.

The answer is a general denial and a plea that defendant is suffering from tuberculosis and under the care of a physician; that plaintiff has actual knowledge of her physical condition and her inability to follow him from place to place in his various military assignments.

The cause was tried September 20, 1956, and, at the close of all of the evidence, the court ordered plaintiff's petition dismissed.

Plaintiff's evidence shows that on June 9, 1945, at Quincy, Massachusetts, he and the defendant were married. At the time of the marriage both were in the Navy; that in 1945 plaintiff was discharged from the service and defendant received her discharge from the Waves in 1946.

That after their discharge they made their home with defendant's parents in Omaha, Nebraska; that while living there a boy was born to this marriage, now nine years old, who has since infancy, lived continuously with defendant's parents.

On March 20, 1948, defendant was stricken with pneumonia, and, later, tuberculosis. During her illness she was confined to the County Hospital in Omaha, from which hospital she was transferred to O'Reilly Hospital in Springfield, Missouri, in May, 1948, where she remained a patient until July, 1952, at which time the Government closed the hospital and defendant was transferred to the V. A. Hospital in Excelsior Springs, Missouri, where she remained 22 months.

Plaintiff testified that two or three months after defendant was transferred to O'Reilly

Hospital, he came to Springfield and secured a job with the Electrical Union and later at the O'Reilly Hospital. He stated he resigned over a little incident, returned to Omaha in the early part of 1949 where he finished two years of High School and two years of College; that he got out of College in 1950 and joined the Police Force in Omaha.

He testified he belonged to the Reserves and in August, 1951, went east to see his mother; that he received orders to return to active duty and went back in the Army in Massachusetts in October, 1951. After entering the Army he was sent to Fort Dix, New Jersey, for about five months, at which time he was transferred overseas.

On April 5, 1955, he returned to New York. He testified he did not know when his wife got out of the hospital at Springfield. He stated he had received a letter while overseas from his sister or mother that the defendant had been transferred to Excelsior Springs.

Plaintiff testified that after he was discharged from the Army April 5, 1955, he went to Fort Dix and received orders dated April 14th, to proceed to Fort Leonard Wood; that he was granted a furlough for 45 days before reporting to Fort Leonard Wood, during which time he visited his mother and sister and wrote his wife stating "that I was home and I was coming to Omaha and wanted to talk things over, see if we could straighten things out,". He testified he received a letter in answer to the one he had written in which defendant stated she preferably didn't want to see him. He gave this answer as to the contents of the letter: "That we just weren't alike and everything that had happened between us, we couldn't make a go of it any way whatsoever". He testified:

"Q. Then you came down to Fort Leonard Wood? A. No, I went to Omaha from my mother's house.

"Q. Did you see her there? A. I went and stayed at her mother's house,

where the boy is at, and I had to find out through them where she was actually living at. She was living in an apartment house on 1314 Park Avenue; and the time I was there, I think I just about went up there every day to talk to her, and there was no romanticism or affection whatsoever involved because she didn't desire any at all to start with. And we talked and bickered, so to speak, and I told her that I didn't particularly care to come down here and live the life I'd been leading all these years."

Plaintiff testified that when defendant got out of the hospital at Excelsior Springs he didn't know about it; that he hadn't heard from her for almost a year and had learned through the Red Cross that she was in Omaha; that defendant hadn't written him after she got out of the hospital and that was the reason he stated that defendant really abandoned him in May, 1954. He gave this answer: "I feel she should have let me know she was home".

Plaintiff testified that defendant was paying $50 a month for the upkeep of the boy; that for about five years she had been receiving an allotment from him for $157.10 which had now been reduced to $137.00. He testified:

"Q. Now, when you came back there to Omaha and talked to her, did she tell you that she was not going to live with you and things of that kind? A. Well, it—it's an answer that I got from her. It's not definitely 'No', it's all indications. She didn't come down here to live on account of her health, and she needed a special maid and all that, and I couldn't see that because I figure that a man is still capable of doing a lot of housework, and I wanted to keep the boy and the family together.

"Q. Now, did you make an effort, after you got down here, to get quarters for her to live in out here? A. Yes, I did. Fact is I had a place all

picked out and I had written her another letter asking her to come down, and I told her if she didn't come down I'd apply for a divorce, and she wrote back to me not to issue her any ultimatums."

Witness said after he came to Fort Leonard Wood he had received three letters from defendant. He stated that at the time he joined the Army, defendant was receiving from the Government approximately $150 a month and that she is now getting $181 from her connected service.

He stated he received about $125 for himself; that he was a Specialist Second Class which is equivalent to a Sergeant. When asked if he knew whether defendant's health was such that she could drive from Omaha to the trial, plaintiff stated: "Frankly, I have been kept in the dark, as far as her health is concerned, for the—for about the past three years; a lot more than that." He stated $60 was taken out of his pay for defendant's allotment which is broken down for defendant and the child; that the Government pays $77. When asked if he knew how long defendant had been in the Veteran's Hospital, plaintiff said she went to the hospital in March, 1948, when the baby was about nine months old and that he had found out through the Red Cross that she left the hospital in May, 1954. He gave this answer: " * * * I do know she has been under constant treatment at the Veterans Hospital in Omaha, but only as an out-patient, not as a direct-in-bed patient."

On cross examination plaintiff testified that he considered the Army his home. He testified that when defendant was first stricken she was sent to the Lutheran Hospital and was later transferred to the Douglas County Hospital in Nebraska; that when she was sent to O'Reilly Hospital he accompanied her.

He gave this testimony:

"Q. Now, you are speaking about letters. Hasn't she told you that her reasons for not coming to Fort Leonard

Wood was because she was not physically able to follow you from one post to the other? A. Personally, from my point of view, I'm not a doctor, but I personally feel if she can live in an apartment by herself, she can—

"Q. I'm asking what she told you? A. That's what she told me; yes, sir.

"Q. That she couldn't on account of her health? A. That's what she claims; yes sir.

"Q. And you went out with her to the hospital then, didn't you? A. Yes, sir, I took her to the hospital about two or three times, I think.

"Q. Do you also know that she's not able to work, don't you? A. Yes, sir.

"Q. To do housework? A. That is right, sir.

"Q. Or any other kind of work? A. Yes, sir."

Plaintiff testified he knew the seriousness of defendant's condition. He admitted that while he was in Omaha, on his way to Fort Leonard Wood, defendant furnished him some money to make the trip.

He was recalled and testified that soldiers and members of their family are furnished free hospital treatment when needed. He gave this testimony:

"Q. Now, was it possible for you to get these treatments for the wife if she'd acome on down here? A. If not at Fort Leonard Wood, sir, I could have—it could have been arranged to have—for me to be transferred out by Fitzsimmons and have treatment over there for her; they'd have done the same thing."

The witness stated that defendant said she did not approve of Army medical treatment, although she goes to Veterans Hospitals for treatment. On re-cross examination, he testified that Fitzsimmons Hospital is in Denver.

Defendant testified that she has a place of her own but spends most of her time with her parents. She stated she had an advanced case of tuberculosis, which was service connected and draws disability compensation of $181 a month; that she was first sent to Emanuel Lutheran Hospital; that she collapsed with tubercular pneumonia March 20, 1948, and her case was diagnosed as advanced tuberculosis; that they would not keep her in a private hospital and she was sent to the County Hospital until she could be removed to O'Reilly Hospital. She stated she was at O'Reilly a little over four years, from May, 1948, until July, 1952, when it closed and she was transferred to V. A. Hospital, Excelsior Springs; that she remained there for 22 months.

Defendant testified she and her husband lived with her parents in Omaha continuously until she took sick; that both she and her husband worked. She stated she left Excelsior Springs in May, 1954, against medical authority; that she returned to her parents in Omaha. She said she left Excelsior Springs because the hospital was primarily for men; that there were no facilities for women. She said she left with the idea of applying where there was a woman's ward for T. B.; that she had to stay out for 90 days because of the V. A. policy. She gave this testimony:

"So, when I went home, I knew I had to be under the constant supervision of a physician, so I went to a private chest specialist and told him my problem and he happened to be a consultant at the V. A., and so he arranged for me to get these—this treatment from the V. A. Hospital there in Omaha, Nebraska; * * *"

Defendant testified that her condition was still an active case of tuberculosis; that she was unable to do any kind of work and was at the time receiving shots twice a week. She stated she still had to go to the hospital every week, sometimes twice a week. She gave this testimony:

"Q. And is that—is your physical condition, is that the reason that you didn't come down here and join your husband at Fort Leonard Wood? A. That is absolutely the reason. I have to have a place to live and someone to do my work, look after the child.

"Q. Are you able to work? A. I am not.

"Q. Do you take rest periods through the day? A. I have to spend at least six hours in bed during the day, plus ten hours at night, at the very least.

"Q. So the reason you did—the reason you didn't follow up your husband was on account of your physical condition, your health? A. That, and the fact that he never shows any—gave me any tangible evidence or proof that he had a place or had anything prepared; and I'm not able to come down and look for a place myself. If—if he had anything at all, showed me any kind of proof that he had a place, we might have discussed it; but I couldn't come down here without knowing something about that, plus the fact that I needed medical attention and I didn't know anything about the medical attention down here either."

Defendant testified that she did not drive from Nebraska down to court; that she had never driven a car and didn't know how to drive; that some friends had brought her and she stayed in the back seat of the car. She admitted that when plaintiff visited her she refused to let him sleep with her. She stated that was according to doctor's orders. She testified she did not remember what she had written plaintiff and plaintiff admitted he did not have the letters to offer in evidence. She gave this testimony on cross-examination:

"Q. Now, Mrs. Parenteau, you never intend to come down here and live with your husband, do you? A. If I get well, I will; and I suppose if worse

comes to worse I'll come if I'm well or not if there's nothing else to do.

"Q. Well, now, you told him that you hoped you'd never have to see him again; you told him that up there at the apartment, didn't you? A. No, I never did."

In our opinion we will refer to appellant as plaintiff and respondent as defendant, the position they occupied in the lower court.

■ In a divorce case we are duty bound to review the whole record and reach our own conclusions, and it is our ultimate responsibility to direct the entry of such judgment as in our opinion is justly warranted by the evidence. Where, however, as here, there are irreconcilable conflicts in the testimony, and the decision rests largely upon the credibility of witnesses, we must give due deference to the trial judge who saw and heard all of the witnesses. White v. White, Mo.App., 290 S.W.2d 178, 180; Eikermann v. Eikermann, Mo.App., 283 S.W.2d 391; Dietrich v. Dietrich, Mo.App., 294 S.W.2d 569, 571(1–3).

■ In the beginning we are confronted with a motion to dismiss plaintiff's appeal for failure to comply with 42 V.A.M.S. Supreme Court Rule 1.08 because plaintiff has failed to present a fair and concise statement of facts without argument; because he has only set out abstract, inaccurate statements of law without showing a relation to any ruling of the trial court; and has failed to make specific page references to the transcript of the record in his statement of facts and argument.

It is provided in Supreme Court Rule 1.08(b) "The fair and concise statement of the facts shall be in the form of a statement of the facts relevant to the questions presented for determination. Irrelevant facts and testimony and mere formal matters should not be included in the statement. If desired, such statement may be followed by a statement of testimony of each witness relevant to the points presented.

"(c) The statement of the facts and the argument shall have specific page references to the transcript on appeal, or, if the transcript is printed, to the printed transcript. * * *

"(d) The points relied on shall briefly and concisely state what actions or rulings of the Court are claimed to be erroneous and briefly and concisely state why it is contended the Court was wrong in any action or ruling sought to be reviewed. Setting out only abstract statements of law without showing how they are related to any action or ruling of the Court is not a compliance with this rule."

In Jacobs v. Stone, Mo.Sup., 299 S.W.2d 438, 440(2, 3), the law is stated:

"This court in ruling a motion to dismiss or to affirm under Supreme Court Rule 1.15, supra, based on asserted failure to comply with Supreme Court Rule 1.08, supra, has, in the anxiety to determine causes on their merits, frequently given the latter rule a liberal interpretation; but this court has also time and again urged that Rule 1.08 be observed, because the Rule is not merely a 'show of surface routine.' It is of utility in enabling a painstaking analysis of meritorious contentions, and the observation of it is most conducive to an expeditious, efficient and just review and determination of causes on their merits. The Rule is, of course, for the benefit of the appellate court and counsel. Compliance with the requirements of the Rule enables the court to particularly address itself to, consider and determine the precise questions which appellant considers to be decisive in sustaining appellant's position that a trial court's rulings were prejudicially erroneous.

"It is the duty of an appellant to distinctly point out the alleged errors of a trial court and to show that he was prejudiced by the rulings alleged to be erroneous, and to make specific reference to pages in the transcript on appeal which disclose the bases for the contentions of error in a trial court's rulings." Justice

demands that cases be correctly and speedily determined. This cannot be completely and surely done unless the causes appealed and submitted to the appellate court are properly briefed." Fisher v. Lavelock, Mo. App., 290 S.W.2d 655, 658; Schoenhals v. Pahler, Mo.Sup., 272 S.W.2d 228, 230(6).

Obviously, plaintiff's complaint in the instant appeal is focused on the action of the trial court in denying plaintiff a divorce on the grounds of desertion and in dismissing his petition. An examination of the record reveals that plaintiff has failed to make a fair and concise statement of facts relevant to the questions presented for determination.

■ Following the law as declared by the Supreme Court in Jacobs v. Stone, supra, that Rule 1.08 be observed because the rule is not merely a "show of surface routine" but is of utility in enabling a painstaking analysis of meritorious contentions for the efficient and just review and' determination of the cause on the merits, we think this appeal should be dismissed for failure to make a plain and concise statement of facts.

The statement wholly fails to set out the facts constituting the defense. For instance, the record shows that defendant has a positive case of tuberculosis from which she has been suffering for eight years; that she has been continuously during that time under the treatment of doctors, and, for the most part, in hospitals; that this condition was known to the plaintiff at the time he filed his suit for divorce. Plaintiff testified that while he was visiting in Omaha in 1955, he took defendant to the hospital on three different occasions for treatment. He testified that at the time of the trial defendant was in such physical condition that she was unable to do any kind of work and that defendant had informed plaintiff, by letters, at Fort Leonard Wood, that the reason she did not come to live with him there was because of her physical condition. He does state, in the statement of facts, that defendant

gave her illness as a reason for not living with plaintiff, and then states "notwithstanding the fact that at the time of the trial, she was able to drive all the way from Omaha, Nebraska to Waynesville, Missouri, to attend the trial, and at the trial the respondent looked the very picture of health." This was a misstatement of the evidence, in part, and, in part, it stated facts not in the evidence.

Defendant specifically testified that she did not drive the car to Waynesville from Nebraska and that she could not drive a car but was brought to the trial by friends. There is no testimony that defendant "looked the very picture of health". The statement of facts does not disclose that the defendant testified that she had not refused plaintiff the right to visit her at her apartment while in Nebraska but that she had furnished plaintiff money· to return to his Post at Fort Leonard Wood. The statement does not show that defendant testified that when able to go to Fort Leonard Wood to live with plaintiff she would do so and that, in fact, she would go anyway if necessary to protect their marriage. It does not show that the defendant testified that plaintiff had never revealed to her that he had a place for her to come to and that she could get proper medical attention. In fact, the statement of facts is not sufficient to show the very basis of the trial court's judgment.

■ To prove desertion, within the meaning of Section 452.010 RSMo 1949, V.A.M.S., three elements must be established, namely, (1) cessation from cohabitation without a reasonable cause for one year, (2) an intention on the part of the deserter not to resume cohabitation, and, (3) absence of consent to the separation on the part of the deserted. Crum v. Crum, Mo. App., 217 S.W.2d 715, 717; Parsons v. Albertson, Mo.App., 31 S.W.2d 211; Campbell v. Campbell, Mo.App., 281 S.W.2d 314, 317; Nicholson v. Nicholson, 214 Mo.App. 570, 264 S.W. 82, 85(7, 8).

All three of these elements necessary to constitute desertion, which plaintiff was required to prove in order to secure a divorce, were in issue.

In Schoenhals v. Pahler, supra, 272 S.W. 2d at page 230(6), the Supreme Court stated:

> " 'It is not our duty to search the entire record in order to discover, if possible, error committed by the trial court, but it is the duty of the appellant to distinctly point out the alleged errors of the trial court and to show that he was prejudiced by such rulings, and where such rulings may be found in the transcript.' "

Under Points and Authorities in plaintiff's brief, on page 5, this statement is made:

> "Appellant claims that the respondent deserted him without a just or reasonable cause for a space of more than one year before his petition was filed. Section 452.0101 of the Revised Statutes of Missouri 1949, includes, among other things, abandonment for a space of more than one year.

> "Appellant is contending that the respondent has abandoned him, and in support of that contention, I cite the following cases:"

Plaintiff does not point out in what manner the trial court erred and the authorities cited are abstract propositions of law. For instance, in his first authority he stated "A wife must share her husband's fortune and home when he performs his duty. Deschodt v. Deschodt, 59 Mo.App. 102". And in every one of his citations he merely states abstract propositions of law contained in the case, but he, nowhere, complains that the trial court failed to follow the law cited.

We find from an examination of the record that there is no merit in plaintiff's appeal. The appeal is by this court dis-

missed for failure to comply with Supreme Court Rule 1.08 in that plaintiff failed to make a fair and concise statement of facts; for failure to state points relied on and concisely what actions or rulings of the court are claimed to be erroneous and briefly and concisely state why it is contended the court was wrong in its rulings on matters sought to be reviewed and in setting out only abstract statements of law in his authorities cited without showing they are related to any action or ruling of the court.

So ordered.

RUARK, J., concurs.

STONE, J., writes separate opinion.

STONE, Judge.

I quickly agree that plaintiff's-appellant's brief deserves no word of commendation and merits no accolade of praise. True, it leaves much to be desired and falls far short of perfection—a goal toward which both court and counsel should ever strive with each tolerantly aware, however, that neither reasonably can expect attainment of that goal by the other. But, my appraisal of plaintiff's brief is that, although it does not constitute literal and precise compliance with all of the provisions of Rule 1.08, it reflects a serious and sincere effort toward substantial compliance. Certainly, the brief under discussion is better than those filed by the same author in recent cases [e. g., Watson v. Watson, Mo.App., 291 S.W.2d 198, and Hancock v. Crouch, Mo.App., 267 S.W.2d 36], which we have determined on their merits.

The transcript in the instant case is very short, with oral testimony on the merits occupying only forty-nine pages. Granting that plaintiff's statement of the facts here (almost four printed pages in length, with five page references to the transcript) is no exemplary work of briefwriting artistry, I find it not so unfair, verbose or argumentative as to require dismissal of the appeal. Plaintiff's single point or complaint, to me immediately apparent from his brief, is (in the language of his "points and authorities") that "respondent (defendant) deserted him without a just or reasonable cause for a space of more than one year before his petition was filed" and that, therefore, plaintiff is entitled to a decree of divorce on the statutory ground of desertion or abandonment. Section 452.010, RSMo 1949, V.A.M.S. In support of that single point, plaintiff has cited ten Missouri cases, albeit in unorthodox fashion by adding brief excerpts from the cases. Plaintiff's "argument," unpersuasive though it is, nevertheless may claim the distinction of vitality and novelty. As I read Jacobs v. Stone, Mo., 299 S.W.2d 438 (cited in the principal opinion), the deficiencies in the brief there condemned were far more substantial and glaring than those in plaintiff's brief before us. Mindful of the character of the case at bar and of the concern manifested by our courts when appeals ride off short of their merits, I think that we should dispose of this case on its merits, although I hasten to add that these comments should not be misconstrued as an invitation to ignore the plain and salutary provisions of Rule 1.08 or as condonation of failure to comply therewith. See Beeler v. Board of Adjustment of City of Joplin, Mo.App., 298 S.W.2d 481.

On the facts detailed in the principal opinion, I am persuaded that the learned trial judge properly might have found for defendant-respondent on any of the three essential elements of statutory desertion [Campbell v. Campbell, Mo.App., 281 S.W. 2d 314, 317(1)]; and, being unable to point to any good reason for disturbing the judgment nisi [Forbis v. Forbis, Mo.App., 274 S.W.2d 800, 809(40), and cases there cited], I would affirm that judgment.