**Anna Maydeen KING, Plaintiff-Respondent,**

v.

**Everett KING, Defendant-Appellant.**

**No. 8344.**

Springfield Court of Appeals.

Missouri.

Oct. 9, 1964.

Douglas & Douglas, Neosho, for defendant-appellant.

Graves & Graves, Neosho, for plaintiff-respondent.

STONE, Judge.

■ On September 30, 1963, plaintiff Anna Maydeen King instituted this action by the filing of her petition for separate maintenance. On the next day, defendant Everett King filed his answer and cross-bill, in which he sought a decree of divorce a vinculo matrimonii, i. e., an absolute divorce, on the sole statutory ground that plaintiff Maydeen "[had] absented * * * herself without a reasonable cause for the space of one year" [V.A.M.S. § 452.010], which is "the legal equivalent of 'desertion' as defined in textbooks and reported cases" [Nolker v. Nolker, Mo. (banc), 257 S.W. 798, 803] and is "commonly referred to as desertion." Watson v. Watson, Mo.App., 291 S.W.2d 198, 200. Following trial on January 8, 1964, both plaintiff's petition and defendant's cross-bill were dismissed by the court. Defendant Everett has appealed, insisting that he was entitled to a decree of divorce upon his cross-bill. Since plaintiff Maydeen has not appealed, the propriety of the dismissal of her petition for separate maintenance is not before us. Davis v. Broughton, Mo.App., 369 S.W.2d 857, 858–859; Wilson v. Motors Ins. Corp., Mo.App., 349 S.W.2d 250, 251.

Everett, then 20, and Maydeen, then 17, were married in Pineville, McDonald County, Missouri, on June 2, 1933. Almost twenty-nine years later, to wit, on February 5, 1962, they separated in Diamond, Newton County, Missouri. No children had been born of the marriage. Nothing in the record suggests that, prior to the year before their separation, their marital bark had sailed through more troubled seas or had been buffeted by more tempestuous storms than those encountered in the ordinary domestic voyage. Everett had been in military service for three years during World War II, after his discharge had worked as a contractor for about four years, and for some eleven years prior to 1962 had been employed at Fort Crowder as an equipment operator with civil service status. While Everett thus had been engaged in providing for the family, Maydeen had been cast in the more prosaic, but nonetheless important, role of homemaker and housewife. That she had discharged her duties well was attested by Everett's quick and complete agreement upon trial that she had "made [him] a good wife." Likewise, Everett readily conceded that Maydeen had never told him that "she didn't love [him]" and had never "failed to perform her marital duties."

"A number of times" during a relatively brief period prior to their separation on February 5, 1962, the parties had "some trouble" but (in Everett's words) "not real bad I wouldn't say." As Everett explained it, the trouble was Maydeen's "just griping about this and griping about that." But his testimony suggested that the root of the trouble was that "she felt I was having too much [evening] activity" outside the home, and her testimony definitely confirmed that. Maydeen stated that "he would be gone at least five nights a week, sometimes six," and that she had objected to that as "most any woman would." She believed, but without definite supportive proof, that Everett had been "running around with other women." Apparently to her intuitive feminine mind that was the only reasonable or logical answer to the age-old provocative query (upon trial put by Maydeen to her cross-examiner), "what do men run around all the time at night away from home for?"

Conceding that he had been out five nights "possibly some weeks but not every week," Everett offered an answer to the quoted query (insofar as it pertained to his own conduct) by relating his attendance at meetings of the Masonic Lodge, the Veterans of Foreign Wars, and the American Legion, with particular emphasis upon his

activities as "chairman of the homecoming committee" for a celebration in *October 1961* to honor one Tucker after his election to the office of state commander of the American Legion. But regardless of where or how Everett had spent his evenings, it is reasonable to infer that many absences from home were motivated or prolonged by his admitted feeling that "he just dreaded to come home of an evening," because (so he said) of "what I would face when I would get there." Maydeen's physical condition and time of life may have contributed to the difficulty, for she had undergone a hysterectomy on April 5, 1961, was nervous and unable "to do anything at all" after returning home from the hospital, "had quite a time with the incision healing," and still was unable to work when the parties separated on February 5, 1962.

The incident which culminated in separation occurred on the evening of Sunday, February 4. As Everett prepared to leave "supposedly" for the purpose of visiting a sick neighbor in the hospital, Maydeen expressed a desire to accompany her husband. In her words, "I could tell by the expression on his face he didn't want me to go with him; in fact he just said he didn't want me to go with him." Everett's trial version was that he had told his wife that she "could go along," but that, when she said "yes, but you don't want me to go," he had replied, "well, I just won't go." In any event, an argument ensued in which Maydeen said in substance that she "had *took* all [she] could take of it" and "accused [Everett] of doing this and doing that," insinuating that he was "going with other women." As is usually true in such situations, "one thing led to the other" until (so Maydeen stated upon trial) "he told me that one of us had to leave" and, being physically and financially unable to maintain the home alone (they were then living on a 17-acre tract), she had said that she would leave. Everett testified that he had told his wife "now listen, you don't have to leave," but that she had insisted "I am not going to stay here." That same evening both Maydeen and Everett talked over long distance with a niece in Dallas, and in another long distance call to Joplin Maydeen obtained information concerning bus schedules to Dallas. When she subsequently remarked that she did not have sufficient luggage to complete her packing, Everett volunteered that "in the morning we'll go get you some suitcases"; and so he did. On the evening of Monday, February 5, he put her on a bus at Joplin, and she went to Dallas where she visited for three weeks before returning to Neosho.

Thereafter, she lived in Neosho. Although the record is not definite and complete on this subject, she apparently worked most, if not all, of the time. Her first place of employment was the Big Spring Inn (the nature of her work there was not shown), and at the time of trial she was employed as a clerk at the Newton Hotel. Her gross salary there was $25 per week; her take-home pay, $21.79 per week. The hotel did not furnish her meals. She resided in an apartment, where the rental was $30 per month and she paid the utility bills. It appears that she lived alone.

Everett called at her apartment several times during the interval of some twenty-two months between the date of her return from Dallas and the time of trial. There were at least two conversations with respect to the property settlement upon which the parties reached general oral agreement without the aid of counsel and which, not reduced to writing and over-simplified in statement, was "to split everything down the middle." Everett mentioned in evidence another occasion on which he had taken his wife to close the sale of the 17-acre tract and three occasions on which he allegedly had asked her whether "she needed any money" and she had replied in the negative. The record does not fix the exact date of any of these conversations, but it is clear that all of them related to financial matters and not to possible reunion or reconciliation.

■ Everett's cross-bill sought a divorce on the sole statutory ground of desertion.

To prove desertion, within the meaning of V.A.M.S. § 452.010, three elements must be established, namely, (1) cessation from cohabitation without reasonable cause for one year, (2) an intention on the part of the deserter not to resume cohabitation, and (3) absence of consent to the separation on the part of the deserted.[1] Eschewing an unnecessary discussion of the first element and of the factor of "reasonable cause" inherent therein, it appears that the finding of failure to prove the second element was permissible and justified. Maydeen testified, and the trial chancellor well might have accepted her statement, that "I would have been back home if I had been asked to be." In fact, it is reasonably inferable that Everett was cognizant of that, for, when opposing counsel put the question, "you know that Mrs. King would go back and live together as man and wife at any time, don't you," his indifferent reply was "under her terms," and explanation of or elaboration upon this disinterested, meaningless rejoinder was neither sought nor offered.

█ But if there were doubt as to Everett's failure to prove the first two elements, there is, in our view of the case, no reasonable basis to doubt the propriety of the finding that Everett failed to prove the third element, i. e., absence of his consent to the separation. The importance of this element is attested by numerous holdings that a spouse, who consents to or acquiesces in separation from the other, may not have a divorce on the statutory ground of desertion.[2] Even though a deserting spouse may not have had just cause to have absented himself or herself from the other, and even though the deserted spouse may not have consented to separation in the first instance, nevertheless the absence does not constitute abandonment and will not ripen into statutory desertion, if the deserted spouse, within the statutory period of one year, acquiesces in the separation.[3] And the fact that the deserted spouse neither sought nor evidenced any interest in reunion or reconciliation is an important circumstance indicative of such acquiescence.[4]

█ When Mrs. Rosie Hunter, a close family friend, talked with Everett "shortly after the separation" for the praiseworthy purpose of helping the parties "get together and make a go of it * * *, Everett didn't seem to think there was anything I could say or do that would help, that he hadn't been happy at home for quite some time." And on August 15, 1962 (about six months after the separation), Everett plainly evidenced his desire to make the separation final and permanent by filing a suit for divorce which, however, was dismissed prior to trial. Cf. Campbell v. Campbell, Mo.App., 281 S.W.2d 314, 319(5). In short, "'[t]here is nothing to satisfy us that the separation was against the will and wish of [Everett] or that he was ever desirous that it should cease.'" Boos v. Boos, 88 Mo. App. 530, 533; Scott v. Scott, 44 Mo.App. 600, 605(2). Rather, the inescapable import of the evidence is that the separation was not unwelcome or displeasing to him.

1. Parenteau v. Parenteau, Mo.App., 305 S.W.2d 723, 729(5); Smith v. Smith, Mo.App., 299 S.W.2d 32, 34(2); Crum v. Crum, Mo.App., 217 S.W.2d 715, 717(1); Parsons v. Albertson, Mo.App., 31 S.W. 2d 211(1); Hall v. Hall, 77 Mo.App. 600, 607(2).

2. Nolker v. Nolker, Mo., 257 S.W. 798, 803 (8, 9); Simpson v. Simpson, 31 Mo. 24; Campbell v. Campbell, Mo.App., 281 S.W. 2d 314, 318–319(4, 5); Price v. Price, Mo.App., 281 S.W.2d 307, 312(14), and cases collected in footnote 6.

3. Campbell, supra, 281 S.W.2d loc. cit. 318(4); Nicholson v. Nicholson, 214 Mo. App. 570, 581, 264 S.W. 82, 85(8); Creasey v. Creasey, 168 Mo.App. 68, 96–98, 151 S.W. 219, 227–228(6, 8); Davis v. Davis, 60 Mo.App. 545, 554–555(1); Droege v. Droege, 55 Mo.App. 481, 486.

4. Campbell, supra, 281 S.W.2d loc. cit. 318; Walthen v. Walthen, 101 Mo.App. 286, 73 S.W. 736; Boos v. Boos, 88 Mo.App. 530, 533; Rodgers v. Rodgers, 84 Mo.App. 197, 199; Droege, supra, 55 Mo.App. loc. cit. 485; Gilmer v. Gilmer, 37 Mo.App. 672, 675; Dwyer v. Dwyer, 16 Mo.App. 422, 424.

but that he consented to and acquiesced in it. Price v. Price, Mo.App., 281 S.W.2d 307, 312(14); Plymate v. Plymate, Mo.App., 180 S.W. 29, 30(2).

In these circumstances, the judgment nisi denying a divorce to Everett on the statutory ground of desertion and dismissing his cross-bill was correct and should be affirmed. It is so ordered.

RUARK, P. J., and HOGAN, J., concur.